IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

| | |
|---|---|
| **FRIENDS OF BELL SMITH SPRINGS**, an Illinois not-for-profit corporation, and **REGIONAL ASSOCIATION OF CONCERNED ENVIRONMENTALISTS**, an Illinois unincorporated organization,<br><br>Plaintiffs,<br><br>V.<br><br>**UNITED STATES FOREST SERVICE**, an agency of the United States Department of Agriculture, and **DENNIS WILSON**, in his official capacity as District Ranger, Hidden Springs Ranger District for the Forest Service,<br><br>Defendants. | Case No. 25-cv-1377<br><br>**COMPLAINT FOR VACATUR, DECLARATORY, AND INJUNCTIVE RELIEF**<br><br>National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*.; Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*. |

## I. INTRODUCTION

1. Plaintiffs FRIENDS OF BELL SMITH SPRINGS and REGIONAL ASSOCIATION OF CONCERNED ENVIRONMENTALISTS (Plaintiffs) bring this civil action for vacatur, declaratory, and injunctive relief. Plaintiffs challenge the October 7, 2024 Decision Memo of the Defendant United States Forest Service (Forest Service) signed by Defendant Dennis Wilson, District Ranger of the Hidden Springs Ranger District, approving the McCormick Oak-Hickory Restoration Project ("the Project") in the Shawnee National Forest in Southern Illinois. The

Project authorizes the commercial logging of numerous large and mature hardwoods, many of which are located on steep slopes above Hunting Branch or its tributaries. Hunting Branch flows directly into the nearby Bell Smith Springs National Natural Landmark. The Project is also located in an area where the endangered Indiana bat and other bat species are often found. Although not disclosed in the Decision Memo, Defendants detected endangered Indiana bats and tri-colored bats (a species proposed for listing under the Endangered Species Act ("ESA") in the Project area, and the Defendants' non-public Biological Assessment expressly determined that the Project was likely to adversely affect both of those species.

2. While Defendants may argue that an agency decision-document—like the Decision Memo at issue here—is not necessarily required to contain extensive analysis or all possible relevant information, there can be no dispute that Defendants are legally required to accurately represent the information that they choose to include in that Decision Memo. Here, the Defendants' own internal scientific analyses directly contradict multiple assertions in the October 2024 Decision Memo.

3. This action arises under and alleges violations of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., the Forest Service or the Department of Agriculture's regulations implementing NEPA, 36 C.F.R. Part 220, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq.

4. The Decision Memo is arbitrary, capricious and contrary to law, in violation of NEPA and the APA. NEPA requires that any proposed action with the potential to have a significant impact on the environment must be publicly documented with a thorough examination of those effects. Proposed actions may be exempt from this more detailed analysis if they fall under one of the enumerated Forest Service categorical exclusions (CEs) of 36 C.F.R. § 220.6(e). However,

even when an action falls under an applicable CE, a detailed public analysis of environmental impacts is necessary if extraordinary circumstances warrant it. To this end, the acting agency must consider a range of potential on-site resource conditions that may establish extraordinary circumstances.

5. The violations giving rise to this claim occur due to a failure to either adequately disclose or to accurately represent and fully consider key facts regarding the impacts to extraordinary circumstances that would otherwise prohibit the use of a CE to exempt the Project from more thorough and detailed documentation and analysis in an environmental assessment (EA) or environmental impact statement (EIS). There are several resource conditions present in the Project area that "should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis. . . ." 36 C.F.R. § 220.6(b)(1). The Forest Service neglected a proper examination of, and hard look at impacts to, all relevant resource conditions in the Project area.  The agency's public documentation in its October 2024 Decision Memo instead obscures or omits the Project's potential effect on these resource conditions, leading to arbitrary and capricious conclusions about whether the use of a CE was allowed. These errors and omissions also deprived the public of proper notice as to the Project's actual and likely adverse environmental impacts.

6.The Decision Memo at issue here omits or misrepresents key facts regarding the Project's likely adverse impacts to federally endangered bats and bats proposed for listing and to project-area soils. Impacts to those project-area resources are, or should be, extraordinary circumstances that prevent the agency from using a categorical exclusion and avoiding a more thorough, public NEPA analysis.

7. The Decision Memo is written to falsely suggest that the agency's surveys detected no endangered bats in the Project area. But the Forest Service's non-public August 2024 Biological Assessment (BA), which is not even mentioned or cited in the October 2024 Decision Memo, discloses that endangered bats and a bat species proposed for listing were acoustically detected during those surveys. Biological Assessment at 4–5. The BA then concludes that the Project, even assuming all legally required mitigation measures are fully implemented, is in fact "likely to adversely affect" those endangered bats and could lead to incidental take of endangered bats. *Id.* at 17. Those highly relevant conclusions are not disclosed, much less addressed by the Decision Memo. In the Decision Memo's specific discussion of impacts to extraordinary circumstances, impacts to endangered bats or bats proposed for listing are not mentioned or addressed at all.

8. The Project authorizes logging on steep slopes that could erode into Hunting Branch, which flows directly into the nearby Bell Smith Springs National Natural Landmark. The Decision Memo seriously understates how steep those slopes are, 22% vs 35%, and then incorrectly claims that the agency has monitoring data from multiple prior projects showing that its best management practices (BMPs) will be "effective" at both protecting soil resources and preventing erosion into Hunting Branch and inevitable harm to water quality in Bell Smith Springs. Decision Memo at 2.

9. Plaintiffs' repeated requests to the Forest Service under the Freedom of Information Act for such data have resulted in the agency producing a single monitoring report from the Shawnee National Forest for a project that appears to have been carried out on a much flatter landscape, and that report actually discloses problems with the efficacy of the agency's BMPs. And, as was the case with the Project area's documented endangered bats, impacts to the Project

area's steep slopes and soils are not mentioned or analyzed when the Decision Memo specifically addresses impacts to extraordinary circumstances.

10. The Decision Memo also arbitrarily dismisses possible adverse impacts to Bell Smith Springs. It correctly notes that the Project's activities will be occur outside the National Natural Landmark's formal boundaries, but the Decision Memo ignores the obvious fact that those logging activities will occur on steep slopes above Hunting Branch, which flows directly into the nearby National Natural Landmark.

11. The Project shares many of its deficiencies in its environmental analysis and disclosure of impacts with the previous OA6 logging project planned over twenty years ago in the same area of Shawnee National Forest. The same seventy acres of hardwood logging authorized by the 2024 Decision Memo was previously authorized as part of the larger OA6 project in 1998. That proposal culminated in *Graber v. U.S. Forest Service*, 98-CV-4247-JPG (S.D. Ill. 1999), where the court, in its summary judgment order, ultimately emphasized NEPA compliance and public analysis of scientifically-substantiated mitigation measures to protect soils and potential impacts to the Bell Smith Springs National Natural Landmark. Thus, this action is driven in part by the Forest Service's failure to incorporate the court's orders and underlying concerns from the past into its present endeavors.

12. By failing to publicly and adequately acknowledge the Project's admitted and likely detrimental effect on the relevant resource conditions in its extraordinary circumstances analysis, the October 2024 Decision Memo and its purported adherence to NEPA are arbitrary, capricious and contrary to law in violation of the APA. The Decision Memo should therefore be vacated so the agency can prepare an adequate, public environmental analysis in an EA or EIS as required by law.

13. In addition to the substantive and procedural failures of the Project's impacts analysis, it suffers from serious contradictions in its planning and formulation. The stated purpose of the Project is to "create varying gaps in the canopy and provide increased growing space. . ." in order to "increase overall stand resiliency and allow the oak-hickory habitat that is essential for wildlife to thrive." Decision Memo at 1. According to the Forest Service, this logging activity is needed because stands in the area are "beginning to show signs of decline due to overstocking," which "causes trees to be less resilient to drought, disease, and insect infestation." *Id.* Numerous public comments, from Plaintiffs as well as concerned citizens, challenged this rationale along with the faulty, outdated science it is based on.

14. Many comments submitted were in opposition to the Project. Some commenters rejected the Forest Service's contention that tree stands in the Project area are actually in decline, noting that the site is a healthy forest with a canopy that already allows light in. Others took issue with the agency's forest management practices, arguing that any reduction in tree regeneration is the result of unnecessary and scientifically unsound prescribed burns that damage young trees. Public comments included pictures showing numerous regenerating young oak seedlings on the forest floor in the Project area. However, those oak seedlings exhibited damage from the Forest Service's recent, repeated prescribed burning and that damage from repeated burning was preventing the oak seedlings from growing more than a few feet tall.  Several commenters also pointed out the questionable logic of cutting down larger, older trees when one stated goal of the Project is to "retain a mature overstory of oak and hickories and promote old growth characteristics." *Id.* at 2. Finally, commenters voiced concerns over the Project's proximity to the Bell Smith Springs National Natural Landmark, stating that erosion could cause sediment to be

deposited into Hunting Branch and eventually flow into the Springs even though the Project area did not include that waterway or any part of the Landmark itself.

## II. JURISDICTION AND VENUE

15. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question). Plaintiffs have challenged final agency action as defined by the Administrative Procedure Act, 5 U.S.C. §§ 701-706, as contrary to the law under NEPA and regulations implementing these laws. Plaintiffs have exhausted all administrative remedies and are seeking judicial review of a final administrative action of the Forest Service. Defendant Forest Service is an agency of the United States government and Defendant Wilson is sued in his official capacity as an officer of the United States. This action seeks vacatur and a declaratory judgment, and also any preliminary or permanent injunctive relief as necessary.

16. Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because Plaintiffs Regional Association of Concerned Environmentalists and Friends of Bell Smith Springs reside (maintain their principal place of business) in this district within the meaning of 28 U.S.C. § 1392(c)(2).

17. This case is properly filed in Benton, Illinois and properly before the Benton Division of this District because the events or omissions giving rise to this claim occurred, and are occurring, primarily in the Shawnee National Forest in Pope County, Illinois. 28 U.S.C. § 1392.

18. Plaintiffs are not required to provide Defendants any written notice of intent to sue on claims arising under NEPA and the APA, but, in an effort to avoid litigation, have submitted detailed comments to the Forest Service regarding the June 25, 2024 Project Scoping Notice, requesting detailed consideration of environmental impacts pursuant to NEPA and submitted

Freedom of Information Act requests seeking the entire Project record generally and specifically seeking agency records that supposedly substantiate certain assertions in the challenged Decision Memo.

19. There exists now between the parties an actual, justiciable controversy in which Plaintiffs are entitled to a declaration of their rights, a declaration of the Forest Service's obligations, vacatur of illegal agency action, and any further injunctive relief deemed necessary because of the facts and circumstances hereinafter set forth.

20. Plaintiffs have standing to assert their claims, have exhausted all applicable administrative remedies, and file this Complaint within any applicable statutes of limitations.

### III. PARTIES

21. Plaintiff FRIENDS OF BELL SMITH SPRINGS (FOBSS) is an organization formed over 25 years ago following previous plans by the Forest Service to clear-cut and log over 4,000 acres in and around the Bell Smith Springs canyon. FOBSS was originally an unincorporated association, but it recently became a not-for-profit corporation under Illinois law. FOBSS has over 150 members in 40+ states with a stated goal of preserving Bell Smith Springs National Natural Landmark and other public lands, educating the public about these lands, and promoting low-impact recreation on these lands. FOBSS members currently use and enjoy, and plan to continue to use and enjoy, the Shawnee National Forest and especially the Bell Smith Springs area, for health, recreation, scientific, and aesthetic purposes. They derive these benefits in part from hiking, swimming, nature study, aesthetic enjoyment, photography, viewing or attempting to view native wildlife, including bats, and other activities in and around the Project area. The actions authorized by the Decision Memo will directly adversely impact and impair FOBSS members' use and enjoyment of both the Project area and Bell Smith Springs. The relief sought

by this complaint would remedy or prevent some or all of the harm from the Project to the concrete interests of the members of FOBSS.

22. Plaintiff REGIONAL ASSOCIATION OF CONCERNED ENVIRONMENTALISTS (RACE) is an unincorporated environmental advocacy organization formed in response to land stewardship actions conducted by the Forest Service in several national forests, including the Shawnee. RACE's members currently use and enjoy, and plan to continue to use and enjoy, the Shawnee National Forest for health, recreation, scientific, and aesthetic purposes. They derive these benefits from hiking, swimming, nature study, aesthetic enjoyment, photography, viewing or attempting to view native wildlife, including bats, and other activities in and around the Project area. The actions authorized by the Decision Memo will directly adversely impact and impair RACE members' use and enjoyment of both the Project area and Bell Smith Springs. The relief sought by this complaint would remedy or prevent some or all of the harm from the Project to the concrete interests of the members of RACE.

23. Defendant United States Forest Service is an agency within the United States Department of Agriculture responsible for managing national forests, including the Shawnee National Forest, in accordance and compliance with NEPA, the APA, and their implementing regulations.

24. Defendant Dennis Wilson is the District Ranger for the Hidden Springs Ranger District within the Shawnee National Forest. In his official capacity as District Ranger, Defendant Wilson is sued for his approval of the October 2024 Decision Memo authorizing the Project challenged herein.

## IV. LEGAL BACKGROUND

### National Environmental Policy Act (42 U.S.C. §§ 4321–4370(j))

25. The National Environmental Policy Act's primary purposes are to ensure fully informed decision-making and to provide for public participation in environmental analyses and decision-making. *See* 42 U.S.C. §§ 4332, 4336a.

26. NEPA requires all federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." *Id.* § 4332(2)(C). An EIS must describe all direct, indirect, and cumulative environmental impacts of the proposed action that are reasonably foreseeable, any adverse and unavoidable effects, and alternatives to that action. See *id.* For actions without a reasonably foreseeable significant effect on the environment, or for which the significance of the effect is uncertain, the agency must produce an EA. *Id.* § 4336(b)(2). An EA is a more concise document that lays out either the need for further analysis and documentation in an EIS, or the basis supporting an agency's finding of no significant impact, depending on the extent of environmental impact the action is projected to have. *Id.* Final agency action may generally only be exempt from documentation in an EA or EIS "pursuant to one of the agency's categorical exclusions." *Id.* § 4336(a)(2). The Forest Service's relevant CEs are described at 36 C.F.R. § 220.6(e).

27. NEPA requires all federal agencies to "make available to [jurisdictions], institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment," in order to ensure all stakeholders are fully informed. 42 U.S.C. § 4332(2)(J). To achieve this objective of being fully informed, NEPA mandates extensive public disclosure and analysis of federal agency actions that may cause significant environmental impacts. NEPA allows for categorical exclusions from such extensive disclosures and analysis

under certain circumstances. But an agency still must document how an action fits within the specific parameters of an established categorical exclusion and determine that impacts to resources conditions identified as "extraordinary circumstances" do not otherwise prohibit the use of a categorical exclusion. 36 C.F.R. § 220.6(e). The Forest Service regulations for the process of identifying categorically excluded projects and determining whether impacts to resource conditions identified as extraordinary circumstances prevent the use of a categorical exclusion are found at 36 C.F.R. § 220.6. Those regulations specify that the valid use of a CE to exempt the action from further analysis depends on whether there is "a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions. . .." *Id.* § 220.6(b)(2). The analysis and conclusions prescribed by these regulations require the agency to consider and disclose accurate information regarding any extraordinary circumstance and the likely effects caused by the Project to those resource conditions.

### Administrative Procedure Act (5 U.S.C. §§ 701–706)

28. The Administrative Procedure Act, 5 U.S.C. §§ 701–706, authorizes courts to review final agency actions and hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). So long as the substantive statute at issue does not expressly preclude judicial review and agency action is not committed to agency discretion by law, the APA allows judicial review of final agency action. *Id.* § 701(a). For an agency decision to withstand APA scrutiny the agency "must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 US 29, 43 (1983). An action is arbitrary and capricious "if the agency

relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## V. FACTUAL BACKGROUND

29. The Shawnee National Forest encompasses approximately 289,000 acres of public land in southern Illinois, forming a unique ecological transition zone between the Midwest's hardwood forests and the southern lowland ecosystems. This national forest features flourishing wetlands, grassy openlands, lush canyons, and forests that are home to a rich diversity of plant and animal species, including several that are threatened or endangered. Additionally, the Shawnee contains significant cultural, recreational, and scenic resources that draw visitors from across the region, such as Plaintiffs and their members.

30. In its June 25, 2024 Scoping Notice, the Forest Service first proposed the Project within the Shawnee National Forest. The Project purports to approve action aimed at improving forest health by commercially logging around 70 acres of land in Pope County, east of Route 45 and north of Route 145. Scoping Notice at 1. According to the Project's June 2024 Scoping Notice, the Project is designed to increase overall stand resiliency and allow the oak-hickory habitat to thrive by creating "varying gaps in the canopy" and providing "increased growing space, freeing up water and nutrient resources for the remaining mature and new regenerating oak-hickory stands." *Id.* These same 70 acres were included and targeted for commercial logging by the Forest Service in its larger 1998 OA6 Project.

31. The Project's June 2024 Scoping Notice cites the usage of a CE to avoid documentation in an EIS or an EA. *Id.* at 2. The selected CE is found at 36 C.F.R. §

220.6(e)(12), and the Project is, on its face, designed to operate within the CE's 70-acre land area and 0.5-mile temporary road construction limits.

32. Following the cited CE in the June 2024 Scoping Notice is a preliminary analysis of the seven resource conditions identified in Forest Service agency regulations used to determine the existence of extraordinary circumstances that prohibit the use of CEs. Scoping Notice at 2. These resource conditions are sourced from the Forest Service's NEPA compliance rules in the Code of Federal Regulations stating:

> Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS are:
>
> > (i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;
> >
> > (ii) Flood plains, wetlands, or municipal watersheds;
> >
> > (iii) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;
> >
> > (iv) Inventoried roadless area or potential wilderness area;
> >
> > (v) Research natural areas;
> >
> > (vi) American Indians and Alaska Native religious or cultural sites; and
> >
> > (vii) Archaeological sites, or historic properties or areas.

36 C.F.R. § 220.6(b)(1). In its June 2024 Scoping Notice discussion with regards to federally listed threatened or endangered species, the Forest Service mentions only the presence of the Willdenow's sedge (*Carex willdenowii*) before concluding that the proposed Project activities are unlikely to present a threat to any of the resource conditions listed in Section 220.6(b)(1). Scoping Notice at 2.

33. Defendant Wilson signed the Decision Memo on October 7, 2024, following a public comment period in which Plaintiffs expressed concern regarding the use of a CE for the Project. In the Decision Memo, the Forest Service essentially reiterated the findings of its preliminary analysis from the Scoping Notice of the expressly listed resource conditions that could show "extraordinary circumstance" which would prevent the use of a CE for NEPA compliance. Decision Memo at 3.

## Impacts to Federally Listed Endangered or Threatened Species or Species Proposed for Listing.

34. Regarding the expressly listed resource conditions identified in 36 C.F.R. § 220.6, the Defendants' disclosed analysis and conclusions in the October 2024 Decision Memo are arbitrary and capricious due to the omission of, misrepresentation of, and failure to consider information concerning the presence of the Indiana and tri-colored bat in the Project area and likely adverse effects to both species from the Project's authorized logging. The Forest Service's own internal, non-public and undisclosed analysis expressly found that such adverse effects were likely and incidental take of individual bats was possible even if the Forest Service implemented all legally required mitigation measures. The specific extraordinary circumstances determinations in the October 2024 Decision Memo do not mention these two species, just the Willdenow's sedge. Decision Memo at 3.

35. This arbitrary and capricious decision-making occurs despite the Forest Service's awareness that these species were detected in the Project area by the Forest Service's own surveys. The Biological Assessment (BA) prepared specifically for the Project states that "individual calls for the Indiana bats … and tri-colored bats were identified during the acoustic survey within the Project area." Biological Assessment at 6, citing the McCormick Bat Survey

Report. The BA, prepared by the Forest Service's Hidden Springs Ranger District itself and concurred with by the Marion Sub-Office of the U.S. Fish and Wildlife Service, in its final determination concluded:

> Because surveys indicated potential presence of individual Indiana bats, this proposed action **may *likely to adversely affect* the Indiana bat.** The proposed action ***may likely to adversely affect* the tri-colored bat** but actions will likely not cause jeopardy or jeopardize populations of tri-colored bats. If the proposed project extends beyond the final listing for the tri-colored cat [sic], reinitiation of consultation may be necessary.

*Id.* at 17. There is in fact no such thing as a "may likely to adversely affect" determination for endangered species when engaging in the consultation process required by the ESA. The BA erroneously used the word "may" instead of "is." But this apparent typographical error cannot obscure the BA's overall definitive conclusion of likely adverse effects to both Indiana and tri-colored bats. The BA also concluded that because incidental take of Indiana bats was possible the Project's acreage had to be added to the 2005 Shawnee National Forest Programmatic Biological Opinion's running total for allowable incidental take of Indiana bats. BA at 17-18.

36. The BA evidencing the Forest Service awareness of the Project's likely adverse effects to federally listed bats and bats proposed for listing is dated August 30, 2024, over a month before the October 2024 Decision Memo was released. But this BA, a document drafted by the Forest Service, is never discussed or even cited in the Decision Memo.

37. This BA and its conclusions are further referenced in a Request for Project Input (RPI), an internal, non-public Project document prepared by the Hidden Springs/Mississippi Bluffs Ranger District. Request for Project Input at 9. The district began drafting the RPI on May 8, 2024, and finalized it on October 7, 2024, when it was also signed by Defendant District Ranger Wilson. The RPI memorializes the steps taken by the Forest Service to attempt to comply with the legal requirements for approving the Project, including those imposed by NEPA. One

section of the RPI was completed by the BA's authoring biologist on September 3, 2024, with checked boxes indicating "Yes" that there are extraordinary circumstances related to this proposed action for the federally listed animal species resource condition. *Id.* at 9–10.

38. The Forest Service biologist completing this section of the RPI also expressly references acoustical surveys that detected both Indiana and tri-colored bats and notes that an ESA effects analysis was conducted in the BA regarding those two species. This section of the document further indicates that an additional "environmental analysis" regarding impacts to these listed and proposed species —the "cause-effect relationship" analysis required by the Forest Service's own regulations, Section 220.6(b)(2)—should be completed and that the specific "bullet" regarding impacts to such species in a subsequent section of the RPI needs to be completed to reflect this analysis. RPI at 9. The purpose of such an analysis and update would be for the Forest Service to determine whether, because of any such relationship and adverse impacts to listed and proposed animal species, it was nevertheless still appropriate to use a CE rather than preparing a more detailed public analysis in an EA or EIS.

39. There is no evidence that the additional NEPA environmental analysis regarding the "cause-effect relationship" between the Project's commercial logging and the acknowledged adverse impacts to listed bats and bats proposed for listing ever occurred. The subsequent section of the RPI containing the "bullet" regarding impacts to listed or proposed animal species, *see* RPI at 19, was not updated and, as did the scoping notice, erroneously references only one state-listed plant, as being potentially adversely impacted by the Project.

40. The above-mentioned BA, RPI, and bat surveys were not completed before the June 2024 Scoping Notice. However, all of this information was available to the Forest Service before it finalized and released to the public its Decision Memo in October of 2024. But the specific

findings from these internal, non-public documents regarding the presence of federally listed

and proposed for listing bat species were either absent or, with deceptive language usage by the

Forest Service, misrepresented in the October 2024 Decision Memo. The October 2024 Decision

Memo only briefly mentions federally listed bat species and does not include the BA or RPI

conclusions; it instead offers that "surveys have already been conducted and concluded and no

federally listed bats were captured during mist-net surveys," and that "there are no known

maternity colonies within the project area." Decision Memo at 2.

41. The Defendants' October 2024 Decision Memo makes no mention of the acoustic

surveys that recorded the presence of Indiana and tri-colored bats on multiple occasions. The

specific extraordinary circumstances analysis in the Decision Memo also omits any discussion of

the presence of the federally listed bat species, only noting the Willdenow's sedge as part of its

conclusion that no extraordinary circumstances exist. Id. at 3. The October 2024 Decision Memo

references the Biological Evaluation that the Forest Service conducted to analyze impacts to

plant species but fails to acknowledge or cite to the BA and its analysis of impacts to animal

species. Defendant Wilson signed the RPI on October 7, 2024, the same day he signed the

Decision Memo, and so should have considered the conclusions of the BA and bat surveys and

information in the RPI when approving the Project. These conclusions however were

conspicuously absent from the October 2024 Decision Memo, including its analysis of

extraordinary circumstances.

42. The selective language used in the October 2024 Decision Memo, while not

technically false, appears intended to mislead the public to believe that no evidence was found

that federally listed bat species are present in the Project area. The October 2024 Decision Memo

never mentions the information available to the Forest Service from the BA that endangered bats

were detected in the Project area and that the Project is likely to adversely affect these bats. The October 2024 Decision Memo never evaluates this omitted information or determines whether it establishes the existence of an extraordinary circumstance precluding the use of a CE.

43. The Decision Memo never even cites to the BA or RPI. The Forest Service did not provide the BA or RPI to the public, not even to those who submitted scoping comments, when the agency announced its final decision. As of the date of this complaint, the BA and RPI are not posted and are unavailable to the public on the agency's website for this Project. Plaintiffs only became aware of these documents and the critical information they contain by submitting FOIA requests that legally forced the Forest Service to disclose this otherwise non-public information.

44. All of these foregoing errors in and omissions from the extraordinary circumstances analysis and discussion in the October 2024 Decision Memo make the conclusions in that document regarding impacts to endangered and proposed bat species and whether those impacts preclude the use of a CE arbitrary and capricious. Those errors, omissions and misrepresentations also deprived the public of relevant and material information regarding the Project's likely environmental impacts in violation of NEPA.

**Impacts to Steep Slopes and Erosive Soils and Bell Smith Springs**

45. In the October 2024 Decision Memo's Implementation Methods and Considerations section, Defendants only briefly mention public comment concerns regarding logging on steep slopes in the Project's treatment area. The October 2024 Decision Memo's language states:

> The treatment area has slopes ranging from 9-22%. Several commenters were concerned about logging on steep slopes. State and federal Best Management Practices (BMPs) will be used to minimize erosion and to prevent soil sedimentation into nearby water sources, specifically chapters four and five in the Illinois Forestry BMP handbook. Bare soils, such as log landings, will be seeded and skid trails will have erosion control methods in place to minimize erosion effects. Monitoring data from previous projects were analyzed and BMPs were effective in meeting project objectives.

Decision Memo at 2. It is unclear where the "9-22%" figure originates, however; soil map data gathered for the Project by the Department of Agriculture's Natural Resources Conservation Service, and also disclosed because of Plaintiffs' October 2024 FOIA request, indicates that the conclusion of an upper limit of 22% is erroneous as several soil map units within the Project area are measured with slopes up to 35%. Custom Soil Resource Report for Pope County, Illinois (Soil Report) at 11. The correct slope values were also noted in the RPI signed by Defendant Wilson on October 7, 2024, the same day he signed the Decision Memo where these values were falsely represented. Request for Project Input at 13.  The RPI also found that "[h]azards for erosion on roads and trails as well as rutting hazards are severe and soils are poorly suited." RPI at 13. The Soil Report and RPI were not cited in the Decision Memo, were not posted on the Project website and were not otherwise provided to the public when the Forest Service announced its final decision in October 2024.

46. The October 2024 Decision Memo cites state and federal BMPs, particularly those found in the Illinois Forestry BMP handbook, as justification for the conclusion that the Project's objectives will be achieved while minimizing erosion and soil sedimentation. However, at the time of the October 2024 Decision Memo, the Project had already failed to adhere to these BMPs, as the referenced Forestry BMP handbook states that, during the planning phase, site conditions—including sensitive areas such as steep slopes and erosive soils—should be identified on a map. Illinois DNR Forest Best Management Practices, Planning, at 4–5. The map included in the June 2024 Scoping Notice provided to the public for comment does not indicate these sensitive areas, despite the Forest Service's subsequent October 2024 FOIA request response revealing that the Forest Service had the relevant soil maps on June 10, 2024, fifteen days before the Project's Scoping Notice was released on June 25, 2024.

47. Plaintiffs' October 2024 FOIA request also sought the aforementioned "[m]onitoring data from previous projects" that supposedly substantiated the claim that BMPs were effective. Decision Memo at 2. The initial December 5, 2024, response from the Forest Service yielded only a small selection of articles that discussed best management practices in the *southeastern* United States, volcanic ash-capped soil disturbance recovery in Montana, and compaction of forest soils generally. The response did not contain any studies or monitoring data of BMPs from the Project area, Shawnee National Forest, Illinois, or regions with comparable soil conditions. The requested Project files were only made available several months later, in a follow-up Forest Service response received on March 6, 2025. The sole monitoring report provided, a three-page report from the Kingpin Timber Sale in the Bean Ridge area of Alexander County, Illinois, showing mixed results from the soil BMPs. Site visits found "evidence of ruts and sediment movement" at one of three sites observed, and "bare soil and signs of erosion" on the skid trails at all three sites. Kingpin Ocular and BMP Monitoring at 1.

48. Monitoring data on steep slopes and erosive soils has been a recurring issue in the region due to past U.S. Forest Service actions, some of which were the focus of previous litigation where Plaintiffs were a party. Approximately twenty-five years ago, the court in *Graber v. U.S. Forest Service* granted summary judgment against the defendants in part, ordering the Forest Service to revise the OA6 project's EA to provide for specific mitigation measures applied to soils, to provide the public with "substantial evidence of the efficacy of all the proposed mitigation measures," and to provide "monitoring for the effectiveness of the mitigation measures." *Graber v. U.S. Forest Service*, 98-CV-4247-JPG, slip op. at 21 (S.D. Ill. 1999). The proposed OA6 project area at the center of *Graber* consisted of 3,400 acres set to be logged around Bell Smith Springs. That project ultimately failed because the Forest Service did

not adequately consider steep slopes and erosive soils due to its reliance on BMPs to mitigate environmental impacts, despite having already failed to follow them, similar to the facts that give rise to this action. *Id.* at 20–21.

49. Additionally, the October 2024 Decision Memo discounts concerns voiced in public comments that the Project will negatively affect the Bell Smith Springs National Natural Landmark. The Forest Service claims that there will be no impact to Bell Smith Springs because the Project is outside the Landmark's boundary. This response is inadequate as it ignores the fact that the Project area sits just above the Hunting Branch stream, which feeds directly into Bell Smith Springs. The portions of the Project area closest to Hunting Branch contain some of the more significant slopes and erosive soils, often less than 500 feet from the stream. Soil Report at 9, 11. This creates a risk of sedimentary debris traveling down the eroded slopes and flowing into Hunting Branch, which will deposit it into Bell Smith Springs. The ineffective soil BMPs that the Forest Service is relying on likely will not be sufficient to prevent harm to this sensitive and invaluable ecosystem.

50. Steep slopes and erosive soils are not currently included in the list of resource conditions in 36 C.F.R. § 220.6(b)(1). This was not always the case as steep slopes and highly erosive soils were listed in the description for extraordinary circumstances before their removal in 2002 due to the language's perceived ambiguity. 67 Fed. Reg. 54622 (Aug. 23, 2002). In 2008, however, the Forest Service responded to public comments suggesting that steep slopes and highly erosive soils should be returned to the list of resource conditions stating "[t]he list of resource conditions is intended as a starting place and does not preclude consideration of other factors or conditions by the responsible official with the potential for significant environmental effects." 73 Fed. Reg. 43084 (Jul. 24, 2008). This point is referenced in Plaintiffs' public

comments following the Project's June 2024 Scoping Notice, but Defendants arbitrarily based the extraordinary circumstances discussion exclusively on the currently listed resource conditions despite Forest Service guidance to the contrary. Decision Memo at 3. Nevertheless, the October 2024 Decision Memo does briefly address the impacts to soils and steep slopes, but as noted above the information provided is both inaccurate and incomplete, making these disclosures arbitrary and capricious.

51. In order to fully evaluate the potential harm to their interests and threat of immediate irreparable harm, Plaintiffs' representatives visited the Project site in late May of 2025. The Forest Service, using blue paint had by that time marked the trees it intended to commercially log. The project site includes several streams that are at least intermittent (they had substantial flowing water in them in late May of 2025) and that flow into Hunting Branch. These streams are not marked or otherwise identified on the Project map provided to the public or on the internal maps found in the Project Soil Report. Plaintiffs include this post-decisional information and pictures from their visit to demonstrate the harm to their members' interests and likely irreparable harm to the environment if the Project is implemented.



52. The Shawnee's 2006 Land Management Plan's mandatory standards require filter strips at least 25 feet wide along even intermittent streams, and those standards exclude the trees in such filter strips from the suitable timber base. FW 25.2(S), Shawnee National Forest Land and Resource Management Plan at 12. The Service's BMPs restrict the management actions that can occur within such filter strips.

53. The slopes along these streams are quite steep in many locations, but the Forest Service has marked trees for logging on those steep slopes and well within 25 feet of the streams.



PAGE 24 OF 34 - COMPLAINT FOR VACATUR, DECLARATORY AND INJUNCTIVE RELIEF

54. The Forest Service has even marked trees for logging within the actual stream beds. One such marked tree has already fallen over, creating an opening in the canopy naturally, much like the openings that the Forest Service insists it must mechanically log to create.





55. Nothing in the Decision Memo itself or in the agency's internal Soil Report addresses how these unmarked streams will be protected from erosion when trees are logged on the steep slopes immediately above those streams and even within the stream beds themselves.

## VI. CLAIMS FOR RELIEF

## COUNT ONE

## (Violation of NEPA and the APA)

**Defendants' extraordinary circumstances determination failed to acknowledge and consider adverse impacts to federally listed animal species and animal species proposed for listing.**

56. Plaintiffs reallege all preceding paragraphs.

57. NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions. 42 U.S.C. § 4332(2)(C). Certain established agency procedures may provide that proposed actions be categorically excluded from further analysis and documentation in an EA or EIS. *Id.* § 4336(a).

58. CEs may not be used where there are "extraordinary circumstances" that warrant further analysis and documentation in an EA or EIS. 36 C.F.R. § 220.6.

59. Defendants may argue that an agency decision-document like the Decision Memo at issue here is not necessarily required to contain extensive analysis regarding whether a specific categorical exclusion applies or whether impacts to extraordinary circumstances prevent the use of a CE.  But there can be no serious dispute that Defendants are legally required to accurately represent the information that they choose to include in that Decision Memo regarding how they reached those required conclusions. Here, the Defendants' own internal scientific analyses directly contradict multiple assertions in the October 2024 Decision Memo.

60. The Defendants' October 2024 Decision Memo included materials that were legally deficient and even misleading when describing the conditions of the Project area and impacts to its resource conditions.

61. Defendants approved the Project under a CE without preparing an EA or EIS.

62. In doing so, Defendants determined that no extraordinary circumstances existed that would preclude the use of a CE.

63. Defendants violated NEPA by invoking a CE despite the presence of known extraordinary circumstances, including the documented presence of a federally-listed endangered species, the Indiana bat, and the tri-colored bat, a species proposed for listing. By failing to disclose or expressly consider the determinations in the BA that the Project was likely to adversely affect both of those species and in the RPI that extraordinary circumstances in fact existed the Forest Service entirely failed to consider an important aspect of the problem and offered an explanation for its decision that runs counter to the evidence before it.

64. The Defendants' extraordinary circumstances analysis in the October 2024 Decision Memo lacked a meaningful and candid discussion of impacts to federally listed bat species by completely omitting the separate findings in the BA and RPI, and misleading the public regarding the most basic information—that the agency had detected both species within the project area.

65. Accordingly, the Defendants' determination that no extraordinary circumstances exist that would preclude the use of a CE pursuant to NEPA is contrary to law, not supported by substantial evidence, and arbitrary and capricious and should, therefore, be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

## COUNT TWO

### (Violation of NEPA and the APA)

### Defendants' extraordinary circumstances determination failed to adequately acknowledge and consider steep slopes and erosive soils.

66. Plaintiffs reallege all preceding paragraphs.

67. NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions. 42 U.S.C. § 4332(2)(C). Certain established agency procedures may provide that proposed actions be categorically excluded from further analysis and documentation in an EA or EIS. *Id.* § 4336(a).

68. CEs may not be used where there are "extraordinary circumstances" that warrant further analysis and documentation in an EA or EIS. 36 C.F.R. § 220.6.

69. Defendants may argue that an agency decision-document like the Decision Memo at issue here is not necessarily required to contain extensive analysis regrading whether a specific categorical exclusion applies or whether impacts to extraordinary circumstances prevent the use of a CE.  But there can be no serious dispute that Defendants are legally required to accurately represent the information that they choose to include in that Decision Memo regarding how they reached those required conclusions. Here the Defendants' own internal analyses directly contradict multiple assertions in the October 2024 Decision Memo, and defendants lack the evidence supporting their assertions on the Decision Memo regarding their ability to effectively mitigate harms to impacted resource conditions. The Decision Memo also fails to disclose or properly consider potential adverse impacts to Bell Smith Springs National Natural Landmark which is immediately downstream from the Project area.

70. The Defendants' June 2024 Scoping Notice and October 2024 Decision Memo included materials that were legally deficient in accurately describing the conditions of the Project area and likely impacts to its resource conditions.

71. Defendants improperly and illegally determined that no extraordinary circumstances existed that would preclude the use of a CE.

72. In doing so, Defendants illegally approved the Project under a CE without preparing an EA or EIS.

73. Defendants violated NEPA by invoking a CE despite the effects on resource conditions that should have been treated as extraordinary circumstances: the documented presence of steep slopes and erosive soils in the Project area.

74. The Defendants' extraordinary circumstances analysis in the October 2024 Decision Memo lacked any meaningful discussion of impacts to these undisclosed steep slopes, streams, and erosive soils, and failed to even treat the presence of such slopes and soils as an extraordinary circumstance, thus ignoring an important aspect of the problem.

75. By omitting critical information from the June 2024 Scoping Notice and October Decision Memo, and claiming to have supporting information they do not in fact have, Defendants acted arbitrarily and capriciously, depriving the public of a meaningful opportunity to provide informed input on the potential impacts of the proposed actions and the appropriateness of using a CE.

76. Accordingly, the Defendants' determination that no extraordinary circumstances exist that would preclude the use of a CE pursuant to NEPA is contrary to law, not supported by substantial evidence, and arbitrary and capricious and should, therefore, be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

## COUNT THREE

### (Violation of NEPA and the APA)

**Defendants failed to prepare an EA when it was uncertain whether the proposed action would have a significant effect on the environment.**

77. Plaintiffs reallege all preceding paragraphs.

78. NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions. 42 U.S.C. § 4332(2)(C). Certain established agency procedures may provide that proposed actions be categorically excluded from further analysis and documentation in an EA or EIS. *Id.* § 4336(a).

79. Compliance with NEPA further requires the responsible Forest Service official to prepare an EA when a federal action's effect on the environment is uncertain. 36 C.F.R. § 220.6(c).

80. Defendants approved the Project pursuant to a CE and did not prepare an EA or EIS.

81. Several resource conditions were present within the Project area that should have been considered when Defendants determined whether likely or uncertain impacts to extraordinary circumstances prevented the use of a CE and required the preparation of an EA. Defendant Wilson should have been aware of the undisclosed information in the BA and RPI regarding likely adverse impacts to listed bat species when he decided to rely upon a CE and to not prepare an EA. Defendant Wilson also should have been aware of the correct information regarding how steep the slopes were in the Project area and should have known that the agency had failed to address the impacts of its proposed logging on those steep slopes and on the nearby Bell Smith Springs National Natural Landmark. Without accurately disclosing and properly considering the totality of scientific information available to the Forest Service, Defendants

could not rationally make the determination required by Section 220.6(c). If Defendants had adequately disclosed and considered this information they would have found that the Project's environmental impacts are, at a minimum, uncertain within the meaning of 36 C.F.R. § 220.6(c).

82. Accordingly, the Defendants' decision to proceed with the use of a CE and not to prepare an EA pursuant to NEPA in the face of uncertain environmental effects is contrary to law, not supported by substantial evidence, and arbitrary and capricious and should, therefore, be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2).

## COUNT FOUR

### (Violation of NEPA and the APA)

**Defendants failed to fully and accurately disclose to the public the Project's potential impacts on federally-listed bat species and species proposed for listing, and on sensitive terrain, and on Bell Smith Springs National Natural Landmark.**

83. Plaintiffs reallege all preceding paragraphs.

84. NEPA requires the Forest Service "to inform the public that environmental concerns were considered in the decision-making process." 85 Fed. Reg. 73620 (Nov. 19, 2020). Public disclosure enables informed decision-making that is integral to the agency's mission. *Id.*

85. The Defendants' public documents for the Project do not acknowledge likely adverse impacts on federally listed bat species, and misrepresent the data that indicates their presence in the Project area. The October 2024 Decision Memo intentionally excludes the known presence of these species from both its assessment and ultimate determination of impacts to extraordinary circumstances, finding no such circumstances that prohibit the use of a CE for this Project. Decision Memo at 3.

86. The Defendants' public documents for the Project fail to adequately discuss the threat of soil erosion due to Project activities, misrepresent the extent of steep slopes in the Project area, and fail to address how they will mitigate the impacts on soils from logging on those steep slopes. The Forest Service does not take steep slopes and erosive soils into account in its specific examination of extraordinary circumstance resource conditions, despite agency guidance that the listed resource conditions are not an exhaustive list of those which should be considered. Decision Memo at 2.

87. Defendants may argue that decisional documents approving the use of CEs are not required to be extensive. However, the Forest Service is obligated to accurately represent the information it does include, and here the agency's own internal scientific analyses directly contradict multiple assertions that are made in the June 2024 Scoping Notice and October 2024 Decision Memo. Moreover, the Decision Memo fails to disclose or consider the potential adverse impacts to Bell Smith Springs National Natural Landmark, immediately downstream from the Project area.

88. The Defendants' arbitrary and capricious actions deny the public an accurate understanding of the Project's range of environmental impacts, undermining the public disclosure standards of NEPA and the Forest Service's own procedures, thereby violating the APA, 5 U.S.C. § 706(2).

## VII. RELIEF REQUESTED

**WHEREFORE**, Plaintiffs respectfully request the following relief:

(A) A declaratory judgment that the Defendants' October 2024 Decision Memo for the Project in its current form violates NEPA and the APA;

(B) A declaratory judgment that the Defendants' failure to adequately consider extraordinary circumstances in its October 2024 Decision Memo was arbitrary, capricious, and in violation of the requirements of NEPA and the APA;

(C) An order vacating and setting aside the October 2024 Decision Memo authorizing action on the Project as illegal agency action under the APA;

(D) Any preliminarily or permanent injunctive relief necessary to prohibit Defendants and their agents or contractors from proceeding with the Project activities described in the October 2024 Decision Memo until the Forest Service can demonstrate compliance with NEPA and its implementing regulations;

(E) An order awarding Plaintiffs their costs of litigation, expenses, expert witness fees, and reasonable attorneys' fees under applicable law; and

(F) Such other and further relief as may seem to this Court to be just and proper.

Dated: July 15, 2025                    Respectfully submitted,

                                        s/Thomas C. Buchele
                                        Thomas C. Buchele
                                        Earthrise Law Center
                                        Lewis & Clark Law School
                                        10101 S. Terwilliger Blvd.
                                        Portland, OR 97219-7799
                                        Tel: 503-768-6643
                                        Fax: 503-768-6642
                                        Email: tbuchele@lclark.edu

                                        Attorney for Plaintiffs