IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

| | |
|---|---|
| **FRIENDS OF BELL SMITH SPRINGS**, an Illinois not-for-profit corporation, and **REGIONAL ASSOCIATION OF CONCERNED ENVIRONMENTALISTS**, an Illinois unincorporated organization,<br><br>Plaintiffs,<br><br>V.<br><br>**UNITED STATES FOREST SERVICE**, an agency of the United States Department of Agriculture, and **DENNIS WILSON**, in his official capacity as District Ranger, Hidden Springs Ranger District for the Forest Service,<br><br>Defendants. | Case No. 25-cv-1377-NJR<br><br>**EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER, OR, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION, AND MEMORANDUM IN SUPPORT** |

Plaintiffs Friends of Bell Smith Springs and the Regional Association of Concerned Environmentalists (collectively "Friends") hereby move this Court for an order, pursuant to Federal Rule of Civil Procedure 65, temporarily restraining the Defendants, United States Forest Service and District Ranger Dennis Wilson, collectively "the Forest Service," from continuing to implement the "intermediate thinning of hardwoods" accomplished using "commercial timber harvest" authorized by the Forest Service's October 7, 2024 Decision Memo, that is challenged by the Complaint in this action. See Declaration of Thomas Buchele, Ex. 1(Oct. 2024 Decision Memo); ECF No. 1 at 1.  Friends filed their complaint on July 15, 2025, ECF No. 1, promptly served it on all defendants, and defendants' counsel entered an

PAGE 1 OF 18 – EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND
MEMORANDUM IN SUPPORT

appearance on August 11, 2025. ECF No. 8. On August 25, 2025, representatives of Friends, who had regularly been checking the site of the authorized logging, noticed that the entrance road to the site had very recently been expanded and improved. They then confirmed that commercial logging had in fact begun and was already causing extensive irreparable harm to the site and Friends' protected interests. Declaration of Sam Stearns, at ¶¶ 10–14. Counsel for Friends then contacted counsel for the Forest Service, who confirmed that logging had in fact very recently begun. Buchele Decl. ¶ 3–4. Friends counsel then offered to forego filing this motion for a temporary restraining order if the Forest Service would halt logging until after a motion for a preliminary injunction could be fully briefed and ruled upon by this Court. The Forest Service's counsel indicated that the Forest Service and its contractor would not voluntarily halt logging, Buchele Decl. ¶ 4, thus requiring Friends to file this emergency motion for temporary relief to preserve the status quo and prevent further irreparable harm to Friends and the Shawnee National Forest until this Court can consider and rule upon a fully briefed motion for a preliminary injunction. Plaintiffs' counsel notified the Court earlier today, via email with opposing counsel copied, that this motion would be forthcoming.

In support of this emergency motion Friends offers the following Memorandum and the Declarations of Thomas Buchele, Sam Stearns, Mark Donham, and Karen Frailey, and their attached exhibits.

MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR A TEMPORARY

RESTRAINING ORDER

I.      Introduction

As has often been said, history has a way of repeating itself.  The logging authorized by the Forest Service's October 2024 Decision Memo was originally authorized by the Forest Service as part of the much larger OA6 Project in 1998. When a group of plaintiff organizations, including current Plaintiff RACE, challenged the OA6 project that same year, the Forest Service also began logging shortly after being served with the complaint. And as is the case now, the Forest Service then also refused to halt its logging until after a motion for a preliminary injunction could be fully briefed and decided, forcing that group of plaintiffs to successfully seek a temporary restraining order, and a preliminary injunction, before eventually obtaining a final ruling on the merits in their favor. See Buchele Decl. Ex. 2, Judgment and Summary Judgment Order in Graber v.USFS, 98-cv-4247-JPG, at 5.

Plaintiffs regret that they must now, once again, force this Court to initially address their claims in the context of an emergency motion, but it is the Forest Service that has, once again, forced them to seek such relief. Defendants approved the challenged logging in early October of 2024. Their decision indicated it would be implemented immediately, but that did not happen. While plaintiffs investigated potential legal challenges by submitting Freedom of Information Act (FOIA) requests during the following months, Buchele Decl. at ¶ 5, they also diligently visited the project site checking for evidence of steps to begin implementation

and checked local newspapers for legal notices soliciting bids for any contract to log the timber. Declaration of Karen Frailey at ¶ 4. There were no such signs until yesterday, August 26th, and Friends believe the Forest Service did not seek public bids for the logging that is now occurring, even though that has been defendants practice in the past and is usually legally required. Moreover, as is discussed below, Friends had good reason to believe logging would not proceed until later this fall at the earliest because the Forest Service's own Land Management Plan says that it generally should not log large potential roosting trees in areas where the endangered Indiana bat is known to be present until after September 30th. The Forest Service's own monitoring detected multiple Indiana bats before it approved the Project, although the Decision Memo itself completely fails to acknowledge that fact. *See* Buchele Decl. Exs. 3 (Biological Assessment) and Ex. 4(McCormick bat survey report).

Friends can carry its burden of persuasion regarding the emergency relief it seeks because it can show it will continue to be irreparably harmed by the logging of large trees, it has no adequate remedy at law for such logging, and it is likely to succeed on the merits of its claims. The balance of harms further supports emergency relief, especially because defendants have already waited ten months to begin logging, and the public interest favors maintaining the status quo until the Court can address the merits in the context of a fully briefed motion for a preliminary injunction. Not issuing a restraining order might allow the Forest Service to moot Friends claims by logging all the large trees and making it difficult if not impossible to obtain meaningful relief. Thus, the Court should as soon as possible issue an order temporarily halting the intermediate thinning via commercial timber harvest that is currently ongoing in the Project area.

II.     Legal Standard

A temporary restraining order, as opposed to a preliminary injunction, is sought and heard on an emergency basis. The purpose of a temporary restraining order is to preserve the status quo pending the complete briefing and consideration of a motion for a preliminary injunction. *See Geneva Assurance Syndicate, Inc. v. Med. Emergency Servs. Assocs.*, 964 F.2d 599, 600 (7th Cir. 1992) ("The essence of a temporary restraining order is its brevity, its ex parte character, and ... its informality."). In general, the showing required for a temporary restraining order and a preliminary injunction are the same. Specifically, a plaintiff must show that "(1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) (quoting *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). As the district court in *Monroe County Bd.of Commissioners v. USFS*, 2023 U.S. Dist. Lexis 53620, *9 (S.D. Ind. March 29, 2023) recently explained, when granting a preliminary injunction against the Forest Service*,* "[c]ourts in the Seventh Circuit employ a sliding scale approach where the greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Citing Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008). If a plaintiff makes the required  showing, the court proceeds to a balancing analysis, to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests. *Id.* Here, Friends can meet its burden and such emergency relief is necessary because of Defendants inexplicable refusal to halt logging for a few weeks while the Court considers a preliminary injunction motion even though the defendants waited more than ten months to start

logging after first authorizing it last October.

III.    Friends is already, and will continue to be, irreparably harmed by the Forest Service's logging of large trees and extensive damage to the Project Area's Soils, and They have no adequate remedy at law for their harm.

Friends supporting declarations detail how they use the Project area itself and the nearby Bell Smith Springs National Natural Landmark for numerous types of recreational and educational activities. They also explain how the ongoing logging of large trees will severely harm their future use of the Project area.  Moreover, these ongoing logging activities using mechanized logging equipment are occurring on the Project area's steep slopes and have already resulted in large amounts of soil being deposited in project area stream beds. Those streams flow directly into Hunting Branch, a large stream that flows into Bell Smith Springs immediately downstream from the Project area. Hunting Branch is, because of its high-quality water, extensively used by Friends members and the general public for recreation, including swimming, and such future use would be irreparably harmed by erosion from the soils already extensively disturbed by defendants' logging. Declaration of Sam Stearns, ¶¶ 7-15; Declaration of Karen Frailey, ¶¶ 5-7; Declaration of Mark Donham, ¶¶ 5-7.

In the first challenge to a Forest Service logging project that was appealed to the Seventh Circuit, Judge Posner had no trouble concluding that the logging of large trees in areas used by the plaintiffs in that case caused clear irreparable harm. *Cronin v. USDA*,919 F.2d 439, 445 (7th Cir. 1990). As Judge Posner explained," [t]he plaintiffs are users of the Fairview area of the Shawnee National Forest; they like it in its present natural state; and trees cut down this fall will not have grown back to their present height till most of the plaintiffs are dead." *Id.* In terms of the balancing of such harms, Posner found "[t]he quantification of such a harm is difficult but on the other side there is—nothing." *Id.* Courts in other circuits have reached the same conclusion.

The Ninth Circuit has held that plaintiffs satisfy the likelihood of irreparable harm requirement when a project will harm a plaintiff's members' ability to "'view, experience, and utilize'" the areas in their undisturbed state," and will "prevent [their] use and enjoyment ... of the forest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (2011) (concluding that logging, even in only a portion of a burned area, establishes a likelihood of irreparable harm); *see also League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (concluding that proposed logging of mature trees, "as with many instances of this type of harm," established irreparable harm for the purposes of the preliminary injunction analysis). Courts also consistently conclude that "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Lands Council v. McNair*, 537 F.3d 981, 1004 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *Accord, Monroe Cnty. Bd. Of Commissioners*, 2023 Lexis 53620, *21-22. In terms of logging specifically, "[n]either the planting of new seedlings nor the paying of money damages can normally remedy such damage." *Connaughton,* 752 F.3d at 764. Friends are not seeking damages here and such damages cannot compensate them for the harm to them that is now occurring in the Shawnee National Forest. The irreparable harm to them from the ongoing logging is not only likely, it has already partially occurred and will undoubtedly continue to occur in light of the Forest Service's refusal to stop the logging they authorized until this Court can consider a fully-briefed preliminary injunction motion.

IV.    Friends can at a minimum make a Strong showing Regarding at least one of their legal claims and can in fact show likely success on the merits.

The Seventh Circuit does not require a party moving for preliminary relief to show that it will definitely win the case in order to obtain injunctive relief, the moving party must make at least

a "strong" showing. *Ill. Republican Party v. Pritzker*, 973 F.3d at 760, 762-63 (7th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). A "strong" showing "normally includes a demonstration of how the applicant proposes to prove key elements of its case."). *Id.* at 763. As noted above, the Seventh Circuit also applies a sliding scale, allowing for a lesser showing on the merits when the moving party has made a very strong showing regarding irreparable harm, as is the case here. But even if Friends were required to show likely success on the merits of its claims, it can do so.

The four claims in Friends complaint all allege violations of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"), 5 U.S.C. §706. *See* ECF 1 at ¶¶ 56-88. NEPA imposes the legal requirements at issue and the APA provides the standards this Court must apply when reviewing an agency's compliance with NEPA.

### A. NEPA

An Illinois district court explained NEPA's requirements in *Hamrick v. General Services Administration*, 107 F.Supp.3d 910, 917–18(C.D. Ill. 2015). NEPA establishes a broad national commitment to protecting and promoting the environment. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989). It is intended to guarantee that government agencies are informed of and fully consider environmental consequences when undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332.  There are several ways in which a federal agency can adhere to its obligation under NEPA. First, federal agencies may be required to prepare detailed statements, usually called an Environmental Impact Statement (EIS), assessing the environmental impact of and alternatives to major Federal actions significantly affecting the environment. The federal agency may also determine that the proposed action or project is categorically excluded from the EIS process. *See* 42 U.S.C. § 4336(a)(2). The

Forest Service's relevant categorical exclusions ("CEs") are found at 36 C.F.R. § 220.6(e) (2024). [1] That regulation also lists resource conditions sometimes called "extraordinary circumstances," which if sufficiently impacted, would prohibit the use of an otherwise applicable CE. *Id*. The Service's regulations further explain that determining whether impacts to extraordinary circumstances prevents the use of a CE requires consideration of whether there is "cause effect relationship between a proposed action and the potential effects on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions…" 36 C.F.R. § 220.6(b)(2).  Finally, the federal agency may prepare an Environmental Assessment ("EA"), which is a document that provides sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. 42 U.S.C. § 4336(b)(2).  The court in *Hamrick*, 107 F.Supp.3d at 918, also noted that "NEPA's requirements are not solely designed to inform the federal agency of the environmental consequences of its action. NEPA documentation notifies the public and relevant government officials of the proposed action and its environmental consequences and informs the public that the acting agency has considered those consequences." *Id.*

B.  APA

The APA provides the standard of review for Plaintiffs' challenges to the Decision Memo's compliance with NEPA. *See Highway J Citizens Group v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003) (reviewing NEPA claim pursuant to APA). Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[1] The U.S. Department of Agriculture recently issued an "interim rule" replacing the Forest Service's 36 C.F.R. Part 220 Nepa regulations. 90 Fed. Reg. 29632-01 (July 3, 2025). However, the Part 220 NEPA regulations were in effect when the Forest Service made the October 2024 Decision at issue and they still apply when evaluating the legality of that agency action. All citations in this motion are to the 2024 version of the 36 C.F.R. Part 220 NEPA regulations.

accordance with the law." 5 U.S.C. § 706(2)(A). This standard of review is narrow and requires

that the court "consider whether the decision was based on a consideration of the relevant factors

and whether there has been a clear error in judgment." *Highway J Citizens Group*, 349 F.3d at

952–53. Thus, if **"**an agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise[,]" the agency action must

be set aside. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory

explanation for its action including a rational connection between the facts found and the choice

made." *Id.* Overall, the Court must ensure "that the agency has taken a 'hard look' at

environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976).

    C.  Plaintiffs will likely prevail on the merits of their NEPA claims.

    The Forest Service's Decision Memo relies upon a categorical exclusion, the one described at

36 C.F.R. § 220.6(e)(12), to supposedly comply with NEPA. None of Plaintiffs' claim challenge

the applicability of this CE to the authorized project. Instead, Friends' claims all challenge the

Forest Service's analysis and conclusions regarding whether the Project's impacts to several

different resource conditions/extraordinary circumstances allowed the Defendants to nevertheless

still rely on the CE and to avoid preparing an EA or EIS.

      Where there is substantial evidence in the record that exceptions to the categorical

exclusion may apply, the agency must at the very least explain why the action does not fall within

one of the exceptions. *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002). Friends

acknowledges that the documentation for an agency decision to rely on a CE need not be detailed

or lengthy, *see Sauk Prairie Conservation Alliance v. US Dept of Interior*, 320 F.Supp.3d 1013 (W.D. Wis 2018), aff'd, 944 F.3d 664 (7th Cir. 2019); however, an agency must rely on something to conclude a specific CE applies and that no extraordinary circumstances prevent reliance on that CE, 944 F.3d at 675. Moreover, as is the case for all NEPA analysis an agency's conclusions cannot be based on entirely false premises or information, and any such conclusions are arbitrary and capricious under the APA. *Van Abemma v. Fornell*, 807 F.3d 633, 639 (7th Cir. 1986).

    1.   Friends will likely prevail on Count One, ECF No. 1 at ¶¶ 56-65.

Species listed as endangered or threatened under the Endangered Species Act (ESA) and species proposed for listing under the ESA are the Forest Service's very first extraordinary circumstance expressly listed under the Service's regulations. 36 C.F.R. § 220.6(b)(1)(i) (2024). Here the Forest Service's analysis regarding the Project's impacts to endangered Indiana bats and tri-colored bats which are proposed for listing under the Endangered Species Act, completely fails to acknowledge that the Forest Service's own monitoring acoustically detected both Indiana bats and tri-colored bats in the project area before the Decision Memo was signed. Instead, the language addressing impacts to bats, which for some reason is not within the Decision Memo's express consideration of extraordinary circumstances, appears to be carefully drafted to suggest, but not actually say, that no bats were found in the Project area. Buchele Decl. Ex. 1, at 2 ("Since Surveys have been conducted and concluded and no federally listed bats were captured during mist-net surveys, there are no known maternity colonies within the project area.").

The Biological Assessment (BA), a document required by the ESA, and prepared specifically for the Project, states that "individual calls for the Indiana bats … and tri-colored bats were identified during the acoustic surveys within the Project area." Buchele Decl. Ex. 3 (Biological Assessment), at 6, citing the McCormick bat survey report, Buchele Decl. Ex. 4, at 5.

The BA, prepared by the Forest Service's Hidden Springs Ranger District itself and concurred with by the Marion Sub-Office of the U.S. Fish and Wildlife Service, then goes on to expressly conclude that both Indiana and tri-color bats are likely to be adversely affected by the Project and incidental take (harm to or killing of bats) is possible. Buchele Decl. Ex. 3 at 17–18. The Decision Memo completely fails to cite to or even acknowledge the existence of the BA and its conclusions.

This BA and its conclusions are further referenced in a Request for Project Input (RPI), an internal, non-public Project document prepared by the Hidden Springs/Mississippi Bluffs Ranger District. Buchele Decl. Ex. 6 (Request for Project Input) at 9. The Forest Service biologist completing this section of the RPI also expressly references acoustical surveys that detected both Indiana and tri-colored bats and notes that an ESA effects analysis was conducted in the BA regarding those two species. This section of the document further indicates that an additional "environmental analysis" regarding impacts to these listed and proposed species —the "cause-effect relationship" analysis required by the Forest Service's own regulations, § 220.6(b)(2)—should be completed and that the specific "bullet" regarding impacts to such species in a subsequent section of the RPI needs to be completed to reflect this analysis. RPI at 9.[2] The purpose of such an analysis and update would be for the Forest Service to determine whether, because of any such relationship and adverse impacts to listed and proposed animal species, it was nevertheless still appropriate to use a CE rather than preparing a more detailed public analysis in an EA or EIS. There is no evidence that the additional NEPA environmental analysis regarding the "cause-effect relationship" between the Project's commercial logging and the acknowledged adverse impacts to listed bats and bats proposed for listing ever occurred. The

---

[2] The Forest Service biologist correctly understood that the ESA effects analysis in the BA is narrower than the required NEPA analysis. See *Makua v. Rumsfeld*, 163 F.Supp. 2d 1202, 1218 (D. Haw. 2001) (explaining different purposes of ESA and NEPA effects analysis).

section of the final Decision Memo containing the "bullet" regarding impacts to listed or proposed animal species, *see* Buchele Decl. Ex.3 at 3, was not updated and erroneously references only one state-listed plant, as being potentially adversely impacted by the Project.

The Decision Memo's consideration of impacts to and conclusions regarding Indiana and tri-colored bats, both of which are an express extraordinary circumstance which could prevent the Service's reliance on a CE, thus completely fails to consider an important aspect of the Project's impacts and offers a conclusion regarding impacts to bats that is contrary to the evidence before the agency, making the Decision Memo's use of a CE arbitrary and capricious. Plaintiffs are therefore likely to prevail on Count 1 of their complaint.

2. Friends will likely prevail on Count Two, ECF No. 1, ¶¶ 66–76.

The Forest Service's Decision memo also fails to properly disclose and consider impacts to two other resource conditions that should have been treated as extraordinary circumstances, logging on steep slopes and impacts to the very close by Bell Smith Springs Natural National Landmark. Although both of these resource conditions are not expressly listed as extraordinary circumstances under 36 C.F.R. § 220.6(b)(1)(2024), during rulemaking the Forest Service told the public that this list was not meant to be exhaustive and decision-makers could treat other resource conditions as extraordinary circumstances. 73 Fed. Reg. 43084 (July 24, 2008). Although the Decision Memo does not label impacts to steep slopes and Bell Smith Springs as extraordinary circumstances, it does respond to public comments regarding these two resources and treats them as part of its overall analysis. By doing so, the Foret Service was bound by the APA's requirements and its analysis in fact violates the APA's most basic requirements.

First, the Decision Memo's assertions about minimizing impacts from logging on steep slopes is premised on a material factual error. The Decision Memo asserts the project area has

slopes ranging from 9-22%. It cites no source for this figure. The Service's Soil Resource Report, Buchele Decl. Ex. 5 at 11, shows slopes up to 35%. The RPI similarly uses the 35% figure. Buchele Decl. Ex. 6 at 13. This is a material error, and the Service's express reliance on and disclosure of such incorrect information makes the Decision Memo's conclusions regarding impacts to steep slopes arbitrary and capricious. *See Van Abemma*, 807 F.2d at 639.

Second, the Decision Memo responds to public comments about impacts to Bell Smith Springs by simply asserting that the Project's actions will not occur within the formal boundaries of the National Natural Landmark. Buchele Decl. Ex. 1 at 3. But the Decision Memo completely ignores the fact that the Project's logging is on slopes above Hunting Branch upstream from Bell Smith Springs, and along streams that flow into Hunting Branch. Any sediment from the Project area that enters Hunting Branch could easily flow into Bell Smith Springs, directly impacting recreational users. The Decision Memo does not acknowledge or address such obvious, potential impacts to a unique resource. The Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County,* 145 S.Ct. 1497, 1515 (2025*),* criticized lower court decisions requiring an analysis of certain types of impacts outside a project area from different actions. However, *Seven County* expressly noted that its criticism and holding did not extend to the actual impacts from a project that could extend beyond the project's boundaries, "such as run-off into a river that flows many miles from the project and affects fish populations elsewhere." *Id.* Thus, *Seven County* cannot help defendants' arbitrary decision here to avoid considering an important aspect of the problem—potential impacts to Bell Smith Springs—by limiting their analysis to impacts within the Project area. Plaintiffs therefore are likely to prevail on Count Two of their complaint.

3.   Plaintiffs are likely to prevail on Counts Three and Four, ECF No. 1, ¶¶ 77–88.

Plaintiffs are also likely to prevail on Counts Three and Four which rely on the factual errors

and omissions discussed above to establish violations of different NEPA requirements. Under

Count Three, by failing to offer a valid explanation for using a CE despite obvious impacts to

multiple extraordinary circumstances, Defendants violated NEPA's requirement to at least

prepare an EA when it cannot use a CE. *See* 42 U.S.C. § 4336(b)(2). Under Count Four,

Plaintiffs will be able to prove that Defendants multiple omissions, errors and misleading

assertions in the Decision Memo violated NEPA's requirement that agency's use their NEPA

documents to inform the public of an action's impacts and assured them that the agency has in

fact considered such impacts before making its decision. See *Hamrick,* 107 F.Supp.3d at 919.

V.      The Balancing of the Equities and Public Interest also Favor Friends' Requested
        Temporary Restraining Order.

The Court must balance the harm the Plaintiffs would suffer in the absence of an injunction

against the harm that the Forest Service would suffer if an injunction were granted. The harm to

the Defendants is the harm from any delay in implementing the Project. The Court must also

consider where the public interest lies. When an environmental injury is alleged, "the balance of

harms will usually favor the issuance of an injunction to protect the environment." *Gambell*, 480

U.S. at 545. The district court in *Monroe County* found that this balance and the public interest

favored issuing preliminary relief against a Forest Service project. Lexis 53620 at *22–26. While

the Forest Service's potential economic losses from a delay are certainly to be weighed in the

balancing of hardships, it is not sufficient to override the harm to Plaintiffs. Indeed, in *Cronin,*

Judge Posner opined that the Forest Service's harm from a delay was in that case "nothing" and

"probably is trivial." 919 F.2d at 445. Courts have consistently held that the public has an interest

in having Congress' mandates in NEPA carried out accurately and completely. *See Siskiyou Regional Educ. Proj. v. Goodman*, No. 04-cv-3058, 2004 WL 1737738, at *13 (D. Or. Aug. 3, 2004) (enjoining logging and finding that "the public interest is not served if the project goes forward in violation of" environmental laws).

While delay by one or both parties sometimes plays a role when addressing the balancing factors, the relevant delay here was by the Forest Service. Plaintiffs needed time to research and evaluate their legal claims, which are mostly based on non-public agency documents that the Forest Service chose to not publicly disclose and took many months to provide in response to Plaintiffs' FOIA requests. Plaintiffs did not obtain the final critical document, the Biological Opinion for the Shawnee National Forest's 2006 Management Plan, until a few weeks before they filed their lawsuit. Buchele Decl. ¶ 5. During this time Plaintiffs were also monitoring the project site and public newspapers for any sign that the Forest Service was taking steps to implement the Project by seeking bids on timber they planned to offer for sale. Frailey Decl. at ¶ 4. There were no such signs until August 26th. Stearns Decl. at ¶ 10. In contrast, the Forest Service's decision to not implement this project for over ten months after the Decision Memo was signed undercuts any argument by them that a much shorter delay while the parties brief a motion for a preliminary injunction would harm them. Finally, any argument for immediate implementation by the Forest Service must address why they waited until the "roosting period" for endangered bats, from April 1st to September 30th, to begin implementing the Project's logging of large trees. The Shawnee Land Management Plan's guidelines for protecting listed species only allow the logging of potential roost tress during the "roosting period" if it is "necessary to accomplish project objectives." Buchele Decl. Ex. 7 (Plan Appendix H) at 287. Defendants approved this project just after the end of that "roosting period" in October of 2024, then waited until it began again this

summer to begin logging the project area's large trees, which could be potential roost trees.

As was the case in *Monroe County*, the balance of equities and public interest favor granting

Friends' requested temporary restraining order against the Project's ongoing logging.

VI.     The Court should not Require a Bond or should order at most a nominal bond consistent
        with Friends' very limited financial resources.

Both Plaintiffs here have very limited financial resources and no paid staff. Stearns Decl. ¶ 4;

Donham Decl. at ¶ 3. RACE essentially has no ability to pay for a bond. Donham Decl. ¶ 3. Friends

has raised some money for litigation expenses, but has not raised money for a bond. Stearns Decl.

at ¶ 4. The court in *Monroe County* recognized that a district court likely has the discretion to

waive FRCP 65(c)'s bond requirement or to reduce it when it exceeds the plaintiffs' ability to pay.

Lexis 53620 at *27-28. But that Court then required a bond of $11,596, which it described as

"nominal." *Id.* at *29. There would be nothing "nominal" about the impact on Plaintiffs here if this

Court were to require a similar bond. Plaintiffs very likely could not pay that amount. Stearns Decl.

at ¶ 4; Donham Decl. at ¶ 3. Thus, if the Court believes a bond is necessary, Friends requests that

it be set at a much lower amount. In the *Graber* case, in 1998, this Court only required a $500

bond. Buchele Decl. at ¶ 2.

VII.    Conclusion

All of the factors for granting preliminary relief favor Friends request for a temporary

injunction, with most tipping strongly in their favor. Thus, for the reasons set forth above, this

Court should issue a temporary restraining order against the "intermediate thinning of hardwoods"

accomplished using "commercial timber harvest" and authorized by the Forest Service's October

7, 2024 Decision. That restraining order should remain in place until the parties have briefed a

motion for a preliminary injunction and the Court has ruled on that motion.

Dated: August 27, 2025                    Respectfully submitted,

                                          s/Thomas C. Buchele
                                          Thomas C. Buchele
                                          Earthrise Law Center
                                          Lewis & Clark Law School
                                          10101 S. Terwilliger Blvd.
                                          Portland, OR 97219-7799
                                          Tel: 503-768-6643
                                          Fax: 503-768-6642
                                          Email: tbuchele@lclark.edu

                                          Attorney for Plaintiffs