IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST SAINT LOUIS DIVISION

| | |
|---|---|
| FRIENDS OF BELL SMITH SPRINGS, *et al.*, | No. 3:25-cv-1377-NJR |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION (Dkt. No. 9)** |
| v. | |
| UNITED STATES FOREST SERVICE, *et al.*, | |
| Defendants. | |

## Introduction

The Forest Service approved the McCormic Oak-Hickory Restoration Project—a forest health project—in October 2024. Claiming that there is an emergency, over 10 months later, Plaintiffs now ask the Court to invoke its injunctive relief to halt this important project while it is underway. The Court should deny this untimely request. Plaintiffs are not likely to succeed on the merits of any of their claims. By their actions—in particular their inexcusable delay—they have shown that they are not likely to suffer irreparable harm. And equity favors letting the Project go forward.

**I.    BACKGROUND**

    **A.    The McCormick Oak-Hickory Restoration Project**

The McCormick Oak-Hickory Restoration Project ("Project"), is a United States Forest Service forest health project that involves mechanical thinning of trees on less than 70 acres of land and requires less than 0.5 miles of temporary roads on Shawnee National Forest. Ex. 3, Scoping Notice at 1. The Project falls within the Mature Hardwood Forest Management

Prescription under the 2006 Shawnee National Forest Land and Resource Management Plan ("Forest Plan"). Ex. 4, Decision Memo 1. Desired future conditions under this management prescription include dominant mature hardwood trees interspersed with open ecosystems. *Id.* The removal of timber by commercial and non-commercial means is allowed under this management prescription to serve many objectives, including wildlife habitat management, enhancement of recreation or visual quality, management of endangered, threatened, or sensitive species, fuels management, pest management, and control of invasive species. Ex. 3 at 1.

The project area is in the northeast section of the Forest in Pope County, Illinois and includes intermediate thinning of hardwood trees to promote ecosystem health and resilience by maintaining oak-hickory stands in the project area. Ex. 4 at 1. The tree stands in the project area are showing signs of decline due to overstocking. Species such as oak and hickory trees are shade intolerant and need sunlight to reach to reach the forest floor to promote regeneration. *Id.* The Project tries to create those conditions by creating varying gaps in the tree canopy and providing increased growing space and more water and nutrient resources for the remaining oak and hickory trees. *Id.* In doing so, the Project will increase the tree stand resiliency and allow oak-hickory habitat, which is essential to wildlife. *Id.*

    **B.**    **Project Implementation and this Lawsuit.**

On June 25, 2024, the Forest Service issued a scoping notice for the proposed Project. Ex. 3, Scoping Notice. The notice described the Project, explained the purpose for the Project, and asked for public comments over three weeks. *Id.* The notice also explained that the Project was subject to a categorical exclusion for environmental analysis under the National Environmental Policy Act (NEPA) and stated that Project implementation was expect to start in October 2024 following a decision to move forward. *Id.* at 2-3. The proposed action was listed in

the Shawnee July Quarterly and the scoping documents were posted on the Shawnee National Forest website. The Forest Service reviewed the public comments and provided responses. Ex. 4 at 3-4. Several commenters mentioned the Bell Smith Springs National Natural Landmark. *Id.* at 3. In response, the Forest Service explained that the Project is located outside of the landmark's boundary. *Id.*

On October 7, 2024, the District Ranger issued a Decision Memo, memorializing the decision to implement the Project. Ex. 4. The District Ranger determined that the action is categorically excluded from additional environmental analysis pursuant to the Forest Service's NEPA regulations. *Id.* at 2-3. The District Ranger found that no extraordinary circumstances would warrant further analysis or documentation in an Environmental Assessment (EA) or an Environmental Impact Statement (EIS). *Id.* In concluding this, the District Ranger examined seven resource conditions identified in the Forest Service's NEPA regulations. The District Ranger found that six of those resource conditions are not present. The remaining resource condition is federally listed threatened or endangered species, designated critical habitat, species proposed for federal listing or proposed habitat, Forest Service sensitive species. *Id.* at 3. For this resource condition, the District Ranger noted that Willdenow's sedge—a state listed species—was found at 4 locations in 2 tree stands. To address this, the Forest Service would revisit the known locations and search the surrounding areas for more plants before project implementation and would flag those locations and create a tight buffer zone where harvest activities would not occur. *Id.* The Forest Ranger concluded that the Project would thus to reduce ground disturbance and damage to the Willdenow's sedge while creating a beneficial change in the light environment for the species and would be unlikely to threaten the viability of the species across the Forest or across its range. *Id.*

3

The one project activity planned in 2025-2026 is a 69-acre tree thinning action using commercial timber harvest to remove trees to allow sunlight to reach the forest floor and promote the growth of future oak and hickory seedlings, enabling them to reach the forest midstory, and over time, the forest canopy. Ex. 1, Declaration of Dennis Wilson ("Wilson Decl.") ¶ 5. Sale preparation for the timber sale, including painting boundaries and designating trees for removal with paint occurred in November 2024. Wilson Decl. ¶ 8. The sale bid results for the timber contract (named "V-Plow") were posted on the Shawnee Forest website on July 3, 2025. Wilson Decl. ¶ 5; *see also* Ex. 2, Report of Timber. And the contract was awarded to Holt Sawmill, Inc. ("Holt") on June 26, 2025. *Id.* Holt began work under this contract on August 21, 2025. Wilson Decl. ¶ 6. Current conditions are operable for thinning operations, and optimal for reducing soil impacts and potential erosion. *Id.* Holt expects completing this activity over three weeks. *Id.*

## II.     LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Goodman v. Illinois Dep't of Fin. & Pro. Regul.*, 430 F.3d 432, 437 (7th Cir. 2005). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Even in a NEPA case, "[a]n injunction should issue only if the traditional four-factor test is satisfied." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

"[A]n applicant for preliminary relief bears a *significant burden*," *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) (emphasis added), and must make a "strong showing" of the "likelihood of success" and "likelihood of irreparable harm." *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 397 (7th Cir. 2022). Likelihood of success on the merits and irreparable harm are "threshold requirements" for a preliminary injunction. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). "If a plaintiff fails to meet any of these threshold requirements, the court 'must deny the injunction.'" *Id.* (citations omitted).

To the extent Plaintiffs seek a temporary restraining order ("TRO"), Federal Rule of Civil Procedure 65 dictates that a court may issue a temporary restraining order *only if* (a) "specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury" to plaintiffs will occur before defendants can be heard in opposition and (b) plaintiffs' counsel certifies in writing their efforts to give notice to defendants and reasons this notice is not required. Fed. R. Civ. P. 65(b). The standards for a preliminary injunction and a TRO are otherwise the same.

**III.    ARGUMENT**

    **A.    Plaintiffs Cannot Show a Likelihood of Success on the Merits**.

        1.    <u>The Forest Service satisfied NEPA by relying on a proper categorical exclusion.</u>

All four of Plaintiffs' counts are brought under the National Environmental Policy Act ("NEPA") and the Administrative Act. NEPA is a procedural statute designed to foster informed decision-making by federal agencies. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA "require[s] only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). In fulfilling that statutory duty, an agency may prepare an EA to determine whether a proposed agency action may have "a reasonably

5

foreseeable significant effect on the quality of the human environment," in which case an EIS is required. 42 U.S.C. § 4336(b).

Alternatively, when a proposed agency action "is excluded pursuant to one of the agency's categorical exclusions" the agency does not have to prepare an EA or an EIS. 42 U.S.C. § 4336(a)(2). "Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental impact is necessary." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013). To comply with NEPA under a categorical exclusion, an agency must first determine whether the proposed action falls within a categorical exclusion and then determine whether "extraordinary circumstances" exist that would prevent application of the exclusion. "Documentation of reliance on a categorical exclusion need not be detailed or lengthy. It need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did." *Wilderness Watch & Pub. Emps. for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004). A more burdensome requirement would defeat the purpose of categorical exclusions, which is "to streamline procedures and reduce paperwork and delay." *Id.*; *see also Sauk Prairie Conservation All. v. U.S. Dep't of Interior*, 320 F. Supp. 3d 1013, 1030 (W.D. Wis. 2018), aff'd, 944 F.3d 664 (7th Cir. 2019).

The Forest Service has issued several categorical exclusions, including the one that applies here. *See* 36 C.F.R. § 220.6(e)(12) ("CE-12"). That categorical exclusion exempts from further NEPA documentation "[h]arvest of live trees not to exceed 70 acres, requiring no more than 1/2 mile of temporary road construction." *Id.* CE-12 lists as an example of the project that properly falls within its ambit, "[c]ommercial thinning of overstocked stands to achieve the

6

desired stocking level to increase health and vigor." 36 C.F.R. § 220.6(e)(12). As identified in the scoping notice for the Project, the "Forest Service proposes a forest health project that . . . involve[s] mechanically thinning less than 70 acres and requiring less than 0.5 miles of temporary roads. Ex. 3 at 1. The Decision Memo confirms that the Project falls within CE-12 and is thus categorically excluded from further NEPA documentation under CE-12. Ex. 4. *See Conservation Congress v. U.S. Forest Serv.*, No. Civ. 2:12-2416-WBS, 2013 WL 2457481, at *8-9 (E.D. Cal. June 6, 2013) (upholding Forest Service's reliance on CE-12 to authorize thinning of fifty to seventy year old ponderosa pine over seventy acres to increase resiliency to western bark beetles, to reduce high fuel loads, and to meet timber production quotas). Plaintiffs do not dispute the Forest Service's reliance on CE-12 here. *See* Complaint for Vacatur, Declaratory, and Injunctive Relief, Dkt. No. 1 ("Compl.") ¶ 31; Emergency Mot. for a Temp. Restr. Order or Prelim. Injunct. Dkt. No. 9 ("TRO/PI Mot.") 10.

    2.    <u>The Forest Service reasonably determined that no extraordinary circumstances precluded the use of CE-12.</u>

In evaluating whether "extraordinary circumstances" related to a proposed project exist, which may justify further analysis and documentation in an EA or an EIS, the Forest Service's categorical exclusion regulation directs the Forest Service to consider a project's impact on seven resource conditions. 36 C.F.R. § 220.6(b)(1). It also directs that "[t]The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion. . . ." *Id.* § 220.6(b)(2). "It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the *degree of the potential effect* of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." *Id.* (emphasis added).

7

Plaintiffs misapprehend that "resource conditions" are synonymous with "extraordinary circumstances." TRO/PI Br. 9; *id.* 13 (equating impacts to bats with extraordinary circumstances). They are not. And their misunderstanding causes them to reach incorrect legal conclusions. The regulation is clear that the existence of a cause-effect relationship and degree of potential effect of a proposed action on resource conditions determines whether extraordinary circumstances exist.

In the Decision Memo, the District Ranger found that six of resource conditions are not present. Ex. 4 at 3. As to federally listed threatened or endangered species, designated critical habitat, species proposed for federal listing or proposed habitat, the Forest Service noted that Willdenow's sedge—a state listed species—was found at 4 locations in 2 tree stands, and that it would revisit the known locations and search the surrounding areas for more plants before project implementation and would create a tight buffer zone where harvest activities would not occur, reducing ground disturbance while creating a beneficial change in the light environment for the species. *Id.* Based on this analysis, the Forest Service concluded that there are no extraordinary circumstances would warrant further analysis and documentation in an EA or an EIS. *Id.*

Plaintiffs do not contest these conclusions. Instead, in Counts One and Two , they contend that the alleged presence of the federally listed Indiana bat and the proposed-for-listing tri-colored bat (Count One) and alleged steep slopes (Count Two) in or near the project area are extraordinary circumstances that require further analysis and documentation in an EA or EIS. Compl. ¶¶ 56-76.

Starting with bats (Count One), Plaintiffs contend that the Forest Service did not consider that the Project is likely to adversely affect both species. *Id.* ¶ 63. This is wrong. In the Project's

Biological Assessment, the Forest Service considered project impacts on both bat species. For the Indiana bat, the Forest Service noted that the 2019 population was estimated at 523,297 bats in 16 states, but it acknowledged that percent change in range-wide population has been -19.2% since 2007. Ex. 6, Biological Assessment 10. But it also noted that Illinois has observed an increase in Indiana bar populations since 2007. *Id.* It thus concluded that while some positive trends for the species exist locally, white-nose syndrome remains a significant threat to the long-term recovery of the species. *Id.* With respect to winter habitat, the Biological Assessment also acknowledges that records show that Ellis cave—a known Indiana bat hibernacula located 12 miles east of the project area—indicate a sharp decline. *Id.* at 12. But it also noted that the bats may have moved to other larger hibernaculum in the area. Based on all the information, the Forest Service's wildlife biologist concluded that the Project may be likely to adversely affect Indiana bat and tri-colored bat, and the Fish and Wildlife Service concurred with that conclusion. *id.* at 17. Plaintiffs complain that the conclusions in the Biological Assessment are not restated in Decision Memo, TRO/PI Br. 12, but they cite no requirement that the Forest Service restate its conclusions from the Biological Assessment twice when it relies on a categorical exclusion. Plaintiffs' proposed requirement would defeat the purpose of categorical exclusions, which is "to streamline procedures and reduce paperwork and delay." *Wilderness Watch*, 375 F.3d at 1095.

For this Project, the Forest Service conducted an acoustic survey and a bat mist-net survey in June – July 2024 within and adjacent to the project area. *Id.* at 5; Wilson Decl. ¶ 17-18. The Biological Assessment explains that individual calls for Indiana bats and tri-colored bats were identified during the acoustic survey within the project area. Ex. 6 at 5-6. The Forest Service followed this up with a mist netting survey to verify bat activity and to determine whether there are roost trees existing within the project area. No bats of either species were

captured. Ex. 7, Bat Survey, at 5; Wilson Decl. ¶ 19. Because surveys were conducted and no federally listed bat species were captured during the mist-net surveys, the Forest Service concluded that there are no known maternity colonies within the project area, Ex, 6 at 6. Based on the survey efforts, consultation with the Fish and Wildlife Service, and adherence with the Forest Plan Biological Opinion, the Forest Service concluded that project activities would not significantly impact the population of the two bat species. Wilson Decl. ¶ 21.

While Plaintiffs claim that the Forest Service did not consider whether the Project is likely to affect bat species, in the Biological Assessment, the Forest Service did just that. It acknowledged the potential presence of those species in or adjacent to the project area, and it conducted surveys to determine their presence. Based on those surveys, it concluded that there were no known maternity colonies of this resource condition within the project area.

The Forest Service also considered potential environmental impacts beyond the listed resource conditions. Regarding soils and slopes (Count 2), the Forest Service conducted a soils survey of the project area using Easter Regional guidelines and slope thresholds for potential compaction, erosion, and sediment transport. Wilson Decl. ¶ 23. Field verification was conducted to confirm slope, soil depth, and erosion risk. *Id.* Best management practices (BMPs) were also reviewed. *Id.* ¶ 24. While the project area has slopes ranging from 5 to 35%, the project treatment area has slopes ranging from 9 to 22%. Ex. 10, Soils Report; Ex. 4 at 2. A minor number of steeper slopes over 22% were identified in the project area. As the slopes increase so does on-the-ground planning to make sure BMPs such as breaking the grade and installing drainage structures, to reduce the potential for erosion. Wilson Decl. ¶ 25. The Forest Service determined that monitoring data from earlier projects showed that BMPs were effective in meeting project objectives. Ex. 4 at 2. And it determined that BMPs will protect soil and water

resources during this Project because they are effective at limiting sedimentation and protecting site productivity when properly implemented. Wilson Decl. ¶ 27.

Bell Smith Springs National Natural Landmark was also identified as a potential issue based on concerns of potential erosion and debris flowing from Hunting Branch into the springs. But after analyzing the soils with mitigations, slope consideration, streamside management zone implementation, and past monitoring of BMP effectiveness, the Forest Service determined that the likelihood of soil movement would be minimal within the project area, causing no impacts to Hunting Branch, which leads to Bell Smith Springs. *Id.* ¶ 30.

Again, though Plaintiffs claim that the Forest Service did not consider project impacts on soils and slopes, the Decision Memo and soils report show that the Forest Service considered such impacts. Based on its analysis of impacts to soils given BMPs and analysis of past projects, the Forst Service reasonably concluded that the Project would have no impacts. The reasoned determination is entitled to deference.

The Forest Service's determination that there are no extraordinary circumstances and warrant additional NEPA analysis is reasoned and entitled to deference. Plaintiffs are not likely to succeed on the merits of Count One or Count Two.

3. <u>Plaintiffs' claims of uncertain environmental impacts and disclosure of project impacts fail for the same reason their challenge to using CE-12 fail.</u>

Plaintiffs contend that there is uncertainty in impacts to bat species and due to soils and slopes in the project area, which require the agency to prepare an EA. Compl. ¶¶ 77-82 (Count 3). Plaintiffs are unlikely to prevail on this claim, which largely rehashes their claims in Counts 1 and 2 that extraordinary circumstances require more NEPA analysis. Plaintiffs are wrong in their claim that the Forest Service did not consider impacts to bat species and soils and slopes. The Forest Service analyzed environmental impacts to both of these resources and concluded that

there would be no significant impacts and that neither warranted justified further analysis. There is no uncertainty in those conclusions.

Plaintiffs also claim that the project documents failed to disclose impacts to bats and soils and slopes that would have affected the extraordinary circumstances analysis, and the appropriateness of applying CE-12 to the Project. Compl. ¶¶ 83-88 (Count 4). This too is largely a rehash of the claims in Count 1 and 2. The Forest Service analyzed impacts to these resources and found that project activities would have no significant impact. Counts 3 and 4 are unlikely to succeed on the merits.

At bottom, Plaintiffs' objections to the Forest Service's reliance on CE-12 amount to challenge to the agency's factual conclusions, which are informed by its reliance on its specialist reports. But the "[t]he bedrock principle of judicial review in NEPA cases can be stated in a single word: Deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 145 S. Ct. 1497, 1515 (2025). Thus, the role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one." *Vt. Yankee Nuclear Power Corp. v.* NRDC, 435 U.S. 519, 555 (1978). The Forest Service's scientific determination is entitled to substantial deference and should be upheld.

Because Plaintiffs are unlikely to succeed on the merits of any of their claims, the Court should deny their request for a temporary restraining order on this basis alone.

**B. Plaintiffs' Delay in Challenging the Project Belies Any Claim that They Will Suffer Irreparable Harm from Completion of the Project.**

The Forest Service approved this Project ten and a half months' ago, on October 7, 2024. Ex. 4 at 4. If Plaintiffs believe that the Project was legally deficient in any way, they could have challenged that Project last fall or during winter, well before implementation could likely begin, and they could have done so without calling on the Court to issue emergency injunctive relief.

Plaintiffs did not do so. Instead, they waited to file their complaint over nine months later, on July 15, 2025, after the Forest Service had implemented the Project by awarding a contract for the commercial thinning. And they waited until nearly a week after the contractor mobilized and started work on the Project. Plaintiffs' delay in seeking to adjudicate their claims suggests that they will suffer no significant harm, much less irreparable harm, if the contractor allowed to complete the work that is well underway.

Plaintiffs try to excuse their failure to assert challenges to perceived legal deficiencies in the October 2024 Decision Memo. They instead blame the Forest Service for "waiting ten months to begin logging." TRO/PI Br. 4, 16. Their excuses are unavailing for several reasons, at least two of which are worth noting: (1) Plaintiffs waited ten months to bring any challenge to the October 2024 Decision Memo, and (2) the Forest Service was in a contracting process during much of 2025 and was not "waiting".

    **C.    The Balance of Equities and Public Interest Do Not Favor Plaintiffs.**

Plaintiffs have not shown that equity or the public interest favor granting injunctive relief. "[T]he balance of equities and considerations of the public interest [] are pertinent in assessing the propriety of any injunctive relief." *Winter*, 555 U.S. at 32. These "factors merge when the Government" is the party opposing the preliminary injunction request. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Without a demonstration that the balance of hardships tips in their favor, Plaintiffs have not met their burden and a preliminary injunction cannot issue. *Winter*, 555 U.S. at 24. Plaintiffs have not met that burden. They allege cutting large trees in an area that they use will cause irreparable harm because trees will be cut. TRO/PI Br. 6-7 (citing three plaintiff declarations). But they fail to acknowledge the irreparable harm that will result if this forest health project is enjoined.

Here, the equities lean in favor of denying injunctive relief. The forested stands in the project area have been identified through data collection as experiencing forest health declines. Wilson Decl. ¶ 31. The cause of that decline is overstocked tree stands, which leads to competition for resources and eventually tree mortality, and reduced wildlife habitat. *Id.* The Project addresses that issue is designed to promote desired forest conditions including dominant and mature hardwood trees interspersed with openland ecosystems while managing wildlife habitat by opening parts of the forest canopy and promoting the growth of shade-intolerant oak and hickory trees, which create food and shelter for wildlife. Ex. 4 at 1. It meets these goals by thinning hardwoods to let sunlight reach the forest floor, which promotes forest regeneration, *Id.*

The Project also helps the public. A healthier forest provides better opportunities for recreating and hunting. Wilson Decl. ¶ 32. And these recreational opportunities contribute to tourism, which helps the local economy indirectly by providing more revenue for local businesses such as gas stations, restaurants, grocery stores, while providing more tax revenue. *Id.* ¶ 33. The Project also helps the local timber industry and the businesses that rely on it. *Id.*

Enjoining the Project would only delay achieving the benefits to forest health, wildlife, recreation, and consequent economic benefits. It also has the potential of causing direct financial damage, particularly since the contractor would need to demobilize operations. There, the Forest Service could suffer direct financial damage in $24,000 due to the loss of having the contractor treat the stand. *Id.* ¶ 34. The District Ranger estimates potential loss of $4,000 due to a reduction in timber value, $4,000 due to a decrease in road maintenance, and an additional $2,000 in staff time to prepare a new contract. In more follow up treatments of non-native invasive species would also be foregone, requiring an additional $17,500 needed to fund those treatments from other sources. *Id.* The Forest Service might also be vulnerable to potential claims from the

14

purchaser for delaying or suspending operations. *Id.* ¶ 35. It also face the risk that it may receive no future bids from timber operators for the Project, which is more than a theoretical concern since it received only one bid after advertising the timber sale for six months. *Id.*

Because the equities favor letting the Project proceed, the Court should deny the request for a temporary restraining order.

### D.   If an Injunction is Granted, a Bond is Required.

A court may award injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P.65(c). Here a bond is appropriate. If an injunction is entered the Forest Service faces the potential incurring significant costs and damages, and a $500 bond as Plaintiffs suggest (TRO/PI Br. 17) would not come close to addressing those costs and damages.

If the Court finds that an injunction is proper, the Court should require Plaintiffs to pay a bond proper to pay the costs and damages sustained by the Forest Service.

### Conclusion

Plaintiffs cannot satisfy the four-factor test for the extraordinary remedy of emergency injunctive relief because they are unlikely to succeed on the merits; they will not suffer irreparable harm; and equity supports Defendants and the public in denying Plaintiffs' motion. The Court should deny Plaintiffs' request for emergency relief.

Dated: August 28, 2025                ADAM R.F. GUSTAFSON
                                      Acting Assistant Attorney General
                                      Environment & Natural Resources Division
                                      U.S. Department of Justice

/s/ *Sean C. Duffy*
SEAN C. DUFFY, NY Bar No. 4103131
Trial Attorney
Natural Resources Section
150 M Street NE
Washington, DC 20002
(202) 598-7291 (Duffy)
sean.c.duffy@usdoj.gov

*Attorneys for Defendants*