IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **FRIENDS OF BELL SMITH SPRINGS** and **REGIONAL ASSOCIATION OF CONCERNED ENVIRONMENTALISTS,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES FOREST SERVICE** and **DENNIS WILSON,**<br><br>Defendants. | Case No. 3:25-CV-01377-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This case involves a dispute over a proposed forest health project in the Shawnee National Forest. The project, approved in October 2024, is designed to reduce overcrowding of hardwood trees in a section of forest covering roughly one-tenth of a square mile.

Plaintiff organizations Friends of Bell Smith Springs and the Regional Association of Concerned Environmentalists (together, the "environmentalist groups") say the United States Forest Service and District Ranger Dennis Wilson (together, the "Forest Service") violated the National Environmental Policy Act (NEPA) when it approved the project. After moving for and obtaining a Temporary Restraining Order (TRO) halting the project, the environmentalist groups urged this Court at a hearing to issue a full preliminary injunction of the project. The Court will deny their motion and dissolve the

TRO because the environmentalist groups have failed to demonstrate a sufficient likelihood of success on the merits of their claim that the Forest Service violated NEPA.

## BACKGROUND

At issue is the McCormick Oak-Hickory Restoration Project (the "Project"), which seeks to address signs of decline in the Shawnee National Forest caused by "overstocking," which occurs when an area of forest "has more trees than the resources can accommodate," decreasing forest resilience to "drought, disease, and insect infestation." (Doc. 9-5, at 2). By permitting commercial logging of some existing trees, the Forest Service hopes to create gaps in the tree canopy, "freeing up water and nutrient resources" for both existing and new oak and hickory trees in the Project area, *id.*, which covers some 67 acres of the Shawnee National Forest in Pope County, Illinois. (*E.g.*, Doc. 10-10, at 12).

In preparing the Project, the Forest Service conducted a wide range of analyses, including at least a Biological Assessment (analyzing the potential effects of the proposed action on local plant and animal species and habitats) (Doc. 9-7), a Bat Survey Report (documenting biologists' attempts to determine the presence or absence of multiple bat species in the Project area) (Doc. 9-8), and a Soil Report (analyzing the soil conditions of the Project area) (Doc. 9-9). As a result of these and other analyses, the Forest Service approved the Project in its Decision Memo of October 7, 2024. (Doc. 9-5). In particular, the Forest Service determined that the Project was exempt from further environmental documentation requirements under NEPA. *Id.*

NEPA, a procedural statute designed to protect the environment, requires federal

agencies to take a "hard look" at environmental consequences. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). Instead of forbidding certain results, NEPA forces agencies to conduct analyses of any proposed actions that might significantly affect the environment. 42 U.S.C. § 4332; *see also Habitat Educ. Ctr., Inc. v. United States Forest Serv.*, 673 F.3d 518, 525 (7th Cir. 2012). In general, an agency considering an action must prepare an Environmental Impact Statement (EIS) or an Environmental Assessment (EA) (which is a somewhat less burdensome analysis meant to determine whether a full-blown EIS is necessary) of that action. *E.g., Sauk Prairie Conservation All. v. United States Dep't of Interior* (*Sauk Prairie I*), 320 F. Supp. 3d 1013, 1025 (W.D. Wis. 2018).

However, under NEPA's then-operant implementing regulations, agencies may determine that certain types of actions are unlikely to significantly affect the environment and may thus be exempted from the requirement of preparing an EIS or EA. 40 C.F.R. § 1501.4 (2024).[1] An action that falls under a defined categorical exclusion (CE) will only require an EIS or EA if there are "extraordinary circumstances in which a normally excluded action may have a significant effect." *Id.*

The Forest Service's regulations explain that, where a CE applicable to a proposed Project is identified, the Forest Service must then conduct an extraordinary circumstances

---

[1] At all times relevant to this case, the Forest Service's compliance with NEPA was governed by two sets of regulations: those issued by the Council on Environmental Quality (National Environmental Policy Act Implementing Regulations, 40 C.F.R. §§ 1500.1–1508.1 (2024), *rescinded by* 90 Fed. Reg. 10610 (Feb. 25, 2025)) and those issued by the Forest Service (National Environmental Policy Act Compliance, 36 C.F.R. §§ 220.1–.7 (2024), *rescinded by* 90 Fed. Reg. 29632 (July 3, 2025)). For purposes of this order, the Court will cite to the relevant regulations as they existed at the time.

analysis by looking at a non-exhaustive list of "Resource Conditions" and determine whether any such conditions are present within the Project area. *See* 36 C.F.R. § 220.6(a)–(b). If so, the presence of the condition does not necessarily preclude use of the CE; instead, the Forest Service must determine whether the Project would cause a sufficiently significant effect on the condition to create an extraordinary circumstance. *Id.*

Here, the Forest Service determined that the Project was covered by its CE for the harvest of trees on less than 70 acres and requiring less than one-half mile of temporary road construction, 36 C.F.R. § 220.6(e)(12) (2024), and published that determination in its Decision Memo. (Doc. 9-5). In the Memo, the Forest Service stated that there were no extraordinary circumstances that would preclude the use of its chosen CE. *Id.*

On behalf of their members who enjoy the Project area and its surroundings in their current state, the environmentalist groups filed this suit for vacatur of the Forest Service's determination, as well as declaratory and injunctive relief, arguing that NEPA requires more (Doc. 1). Subsequently, logging under the Project commenced. (Doc. 9). When the environmentalist groups learned of this, they quickly filed a motion seeking emergency injunctive relief. *Id.*[2] Within 24 hours, a responsive memorandum in opposition from the Forest Service (Doc. 10) and a reply by the environmentalist groups (Doc. 11) were filed. This Court granted a TRO to halt the logging and preserve the status quo until the question of a preliminary injunction could be considered. (Doc. 12).

---

[2] The Forest Service, in its responsive memorandum, confirmed that logging under the Project in fact began on August 21, 2025. (Doc. 10).

## LEGAL STANDARD

A party seeking a preliminary injunction must demonstrate (1) a likelihood of success on the merits, (2) that he or she will suffer irreparable harm absent injunctive relief, and (3) that he or she has no adequate remedy at law. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)); *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). "If these requirements are met, the court must then balance the degree of irreparable harm to the plaintiff against the harm that the defendant will suffer if the injunction is granted." *Incredible Techs.*, 400 F.3d at 1011 (citing *Publ'ns Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473 (7th Cir. 1996)). The Court must also consider the public interest in granting or denying an injunction. *See Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

An agency decision that allegedly violates NEPA may only be set aside if it is arbitrary and capricious under the Administrative Procedure Act (APA). *Habitat Educ. Ctr., Inc.*, 673 F.3d at 525 (citing 5 U.S.C. § 706(2)(A)); *Sauk Prairie Conservation All. v. United States Dep't of Interior* (*Sauk Prairie II*), 944 F.3d 664, 669–70 (7th Cir. 2019); *Sauk Prairie I*, 320 F. Supp. 3d at 1022. "We only must ask whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Sauk Prairie II*, 944 F.3d at 670 (quoting *Highway J. Citizens Grp. v. Mineta*, 349 F.3d 938, 952–53 (7th Cir. 2003)).

Finally, the Court emphasizes that, because agency determinations under NEPA are typically fact-bound and therefore implicate agency expertise, "[t]he central principle

of judicial review in NEPA cases is deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. ___, 145 S. Ct. 1497, 1511 (2025). When evaluating such agency determinations, "'the ultimate standard of review is a narrow one.' . . . 'If the agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates agency expertise and is entitled to deference.'" *Highway J. Citizens Grp.*, 349 F.3d at 953 (first quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989); and then quoting *Indiana Forest All., Inc. v. United States Forest Serv.*, 325 F.3d 851, 859 (7th Cir. 2003)). "In fact, '[t]he only role' for a court in applying the arbitrary and capricious standard in the NEPA context 'is to insure that the agency has taken a 'hard look' at environmental consequences.'" *Id.* (quoting *Kleppe*, 427 U.S. at 420 n.21).

## Discussion

The essence of the environmentalist groups' complaint can be boiled down to two claims. First, the Forest Service acted arbitrarily and capriciously when it determined that the Project was subject to a CE because it failed to sufficiently consider potential extraordinary circumstances. (Doc. 1, at ¶¶ 56–82; Doc. 9, at 11–15).[3] Second, even if the

---

[3] The environmentalist groups' complaint contains four counts. (Doc. 1). The first two counts allege the Forest Service either did not consider or misconstrued facts as to potential extraordinary circumstances that would preclude the use of a CE. *Id.* at ¶¶ 56–76. Though there is a separate third count in the complaint—that the Forest Service violated NEPA by failing to prepare an EA, *id.* at ¶¶ 77–82—the Court does not consider this a separate claim from counts one and two. The logic of the environmentalist groups' argument is that, because the Forest Service did not adequately consider whether extraordinary circumstances existed, the Service was therefore uncertain of the environmental consequences of the Project—triggering the requirement that it prepare an EA. Because count three is, if true, a logical consequence of counts one and two, it is not truly a separate claim; if the Forest Service adequately considered the potential extraordinary circumstances and non-arbitrarily or capriciously determined the CE still applied, it did not violate NEPA by failing to prepare an EA. The Court thus finds it appropriate to treat counts one through three as one claim for the purpose of evaluating the environmentalist groups' likelihood of success on the

Forest Service did adequately consider potential extraordinary circumstances in making its CE determination, it acted arbitrarily and capriciously by failing to "fully and accurately" disclose to the public the information considered in making that determination. (Doc. 1, at ¶¶ 83–88; Doc. 9, at 15).

As explained below, the Court finds that the environmentalist groups have not demonstrated a sufficient likelihood of success on either claim to justify a preliminary injunction. *See Ill. Republican Party*, 973 F.3d at 762–63.

## I.     Insufficient consideration

The environmentalist groups contend that the Forest Service arbitrarily and capriciously determined that no extraordinary circumstances precluding the use of a CE existed. They raise three potential extraordinary circumstances that the Forest Service allegedly failed to sufficiently consider in making its determination: (1) the potential presence of Indiana bats and tri-colored bats in the Project area; (2) the presence of steep slopes within the Project area; and (3) the possibility of soil erosion from the Project area into tributaries of Bell Smith Springs National Natural Landmark.

As far as the Court can determine, the Seventh Circuit Court of Appeals has not yet confronted the specific question of what analysis an agency must undertake to justify a finding that no extraordinary circumstances exist. *See Highway J Citizens Grp. v. United States Dep't of Transp.*, 891 F.3d 697 (7th Cir. 2018) (agency was entitled to rely upon existing state-created environmental report when determining no extraordinary

---

merits.

circumstances existed without drafting its own, separate report). However, "courts have held that '[d]ocumentation of reliance on a categorical exclusion need not be detailed or lengthy. It need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did.' A more burdensome requirement would defeat the purpose of categorical exclusions, which is 'to streamline procedures and reduce paperwork and delay.'" *Sauk Prairie I*, 320 F. Supp. at 1030 (alteration in original) (quoting *Wilderness Watch & Pub. Emps. for Env't Resp. v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004)).

When courts have found agency CE determinations arbitrarily and capriciously insufficient, it has typically been due to an absence in the administrative record of any evidence that the agency contemporaneously considered whether a CE applied or if extraordinary circumstances existed. *See, e.g.*, *Hamrick v. Gen. Servs. Admin.*, 107 F. Supp. 3d 910, 925 (C.D. Ill. 2015) (absence in record of any evidence agency considered "the possibility of *any* environmental consequences, or the possibility of 'extraordinary circumstances'" was arbitrary and capricious); *Wilderness Watch*, 375 F.3d at 1095 ("After reviewing the record, we cannot find any indication that the Park Service considered the application of the categorical exclusion prior to its decision, nor does the agency direct our attention to any such evidence."); *California v. Norton*, 311 F.3d 1162, 1175–77 (9th Cir. 2002) (post hoc argument that categorical exclusion applied was insufficient where there was no evidence of a contemporaneous categorical exclusion determination); *see also Reed v. Salazar*, 744 F. Supp. 2d 98, 116–18 (D.D.C. 2010); *Edmonds Inst. v. Babbitt*, 42 F. Supp. 2d 1, 18 (D.D.C. 1999) ("[A] post hoc invocation of a categorical exclusion during litigation

cannot justify a failure to prepare an EA or EIS."). Sometimes, it is instead because the agency provided only a cursory explanation, *see, e.g.*, *Am. Wild Horse Campaign v. Burgum*, 768 F. Supp. 3d 1291, 1321–22 (D. Colo. 2025), or no explanation whatsoever, *see, e.g.*, *Jones v. Gordon*, 792 F.2d 821, 827–29 (9th Cir. 1986), thus preventing the reviewing court from being able to determine whether the agency had actually meaningfully considered the question.

On the other hand, so long as the record demonstrates that an agency *did* contemporaneously consider extraordinary circumstances and come to a non-arbitrary or capricious conclusion, courts have generally upheld the determinations. *E.g.*, *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 680–81 (9th Cir. 2022); *see, e.g.*, *Sierra Club v. United States Forest Serv.*, 828 F.3d 402, 410–412 (6th Cir. 2016); *Utah Env't Cong. v. Bosworth*, 443 F.3d 732, 741–44 (10th Cir. 2006); *Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1117–22 (E.D. Cal. 2017).

### a. Indiana bats and tri-colored bats

The environmentalist groups argue that the presence in the Project area of Indiana bats, a federally listed endangered species, and tri-colored bats, a species proposed for listing, constitute an extraordinary circumstance. (Doc. 9, at 11–13). They point to the Forest Service's Biological Assessment, which detected the calls of these bat species in or near the Project area and concluded the Project "may likely [sic] to adversely affect" the bats (Doc. 9-7, at 6–7, 18). They claim this finding is ignored at best and contradicted at worst by the Decision Memo, rendering arbitrary and capricious the determination that these species' presence does not constitute an extraordinary circumstance. (Doc. 9, at 12–

Page 9 of 20

13).

The Court disagrees. The Decision Memo explains that wildlife surveys were conducted, and as a result, specific mitigation measures were to be implemented with the Project, reducing the likelihood of "incidental take[4] and prevent[ing] adverse effects o[n] federally and state-listed bat species." (Doc. 9-5, at 3). It also explains that surveys had been conducted for bats and that no federally listed bats were captured during the survey. *Id.* This is a reference to the 2024 Bat Survey Report (Doc. 9-8) conducted for the Project, the results of which are incorporated into the Biological Assessment. (Doc. 9-7). The Bat Survey Report indicates that the Forest Service set up acoustic monitors to detect the calls of bats; when the calls of Indiana and tri-colored bats were heard at some of the monitoring sites on some of the nights, they set up nets to attempt to capture those bats, which would have indicated a greater or more permanent presence of the species in the Project area. (Doc. 9-8, at 5–7). No specimens of either the Indiana or the tri-colored bats were captured. *Id.*

The survey concludes that, while "individual Indiana bats . . . may be present and using the [Project] area for foraging and possibly roosting individually but infrequently . . . with [the] overall number of calls, the evidence does not suggest maternity colonies are present" in the Project area. *Id.* at 13. The Biological Assessment takes those conclusions and conducts an "effects analysis" as to each species. (Doc. 9-7, at 15–18). As to Indiana bats, the Biological Assessment determines that, though

---

[4] "Incidental take" refers to unintentional deaths of individual animals.

unintentional deaths to individuals roosting alone in trees to be felled is possible if the bats go undetected, mitigation measures make loss of maternity colonies or of "overall fitness in the populations" unlikely. *Id.* Moreover, implementation of "snag guidelines" during the Project would "ensure the safety of any unknown maternity colonies and individual roosts as well." *Id.* As to tri-colored bats, "any detrimental effects to the overall population would be very minimal and not jeopardize populations." *Id.* The biological assessment goes on to determine that the Project's completion could potentially benefit the bats through an improved habitat.

In sum, the Biological Assessment and Bat Survey Report indicate that the Forest Service conducted research into the potential effects of the Project on the two bat species and determined that the potential presence of the species was not an extraordinary circumstance. These contemporary analyses are certainly more extensive than courts have required of agency CE determinations in other cases. *See, e.g., Rocky Mountain Peace & Just. Ctr. v. United States Fish & Wildlife Serv.,* 548 F. Supp. 3d 1042, 1061–65 (D. Colo. 2021) (refusing to find arbitrary and capricious a determination that no extraordinary circumstances existed where the extent of the agency's analysis constituted a mere "yes or no" checklist).

The environmentalist groups argue, however, that the Forest Service cannot rely on the Biological Assessment to show they considered the potential effect of the Project on the bat species. (Doc. 9, at 12). They claim that an internal Forest Service document, a Request for Project Input (RPI) (Doc. 9-10, at 10–11), indicates that the Biological Assessment was an Endangered Species Act (ESA) analysis which could not satisfy the

required NEPA analysis. (Doc. 9, at 12 & n.2). The environmentalist groups argue the RPI shows that the Forest Service believed further consideration of the effect on bats was necessary under 36 C.F.R. § 220.6(b)(2) (2024): they claim that even "[t]he Forest Service biologist correctly understood that the ESA effects analysis in the [Biological Assessment] is narrower than the required NEPA analysis," and that "[t]here is no evidence that the additional NEPA environmental analysis regarding" the effect of the Project on the bat species "ever occurred." (Doc. 9, at 12 & n.2).

To begin, the environmentalist groups misapprehend what NEPA and its implementing regulations require of an agency CE determination. Though they rely on *Makua v. Rumsfeld* for the proposition that the analysis in the Biological Assessment is only sufficient for the "narrower" requirements of the ESA, that opinion does not concern an agency determination that a CE applies. 163 F. Supp. 1202, 1216, 1218 (D. Haw. 2001). It is sufficient for an agency to consider the possibility of extraordinary circumstances and reasonably conclude that there are none. *See, e.g.*, *Sauk Prairie I*, 320 F. Supp. 3d at 1030.

Moreover, the Court reads the RPI differently. The instructions on the relevant page indicate that the analysis of the potential effect of the Project on the bat species should be "[b]riefly explain[ed] in 'Comments' below." (Doc. 9-10, at 10). Then, under 'Comments,' the Forest Service biologist explains that the required effects analysis *is in the Biological Assessment. Id.* at 10–11. In other words, the Forest Service's consideration of the potential extraordinary circumstance posed by the bats is contained within the Biological Assessment.

The record before the Court plainly demonstrates that the Forest Service "indeed considered whether or not a categorical exclusion applied" in light of the potential presence of these bat species "and concluded that it did." *Sauk Prairie I*, 320 F. Supp. at 1030 (quoting *Wilderness Watch*, 375 F.3d at 1095). Because the agency has met its burden within the narrow, deferential review assigned to the judiciary in NEPA CE cases, the environmentalist groups cannot demonstrate a likelihood of success on the merits as to their claim that the Forest Service failed to consider the presence of Indiana or tri-colored bat species in making its determination.

### b. Steep slopes

The environmentalist groups also argue that the Forest Service acted arbitrarily and capriciously in its consideration of the slopes in the Project area. (Doc. 9, at 13–14). Their contention is not that the Forest Service failed to consider the steepness of the slopes entirely (Doc. 9, at 14); indeed, the record contains a Custom Soil Resource Report (the "Soil Report") detailing the condition of the slopes in the Project area (Doc. 9-9) and the agency's Decision Memo explains that forestry "Best Management Practices" (BMPs) will be used to mitigate the risks of logging on steep slopes. (Doc. 9-5, at 3). It is plain from the Record that slope steepness was considered.

The environmentalist groups' argument instead focuses on the fact that, in the Decision Memo, the Forest Service states that the slopes in the Project area range from a steepness of 9% to 22% (Doc. 9-5, at 3), while the Soil Report indicates that the range is 5-35%. (Doc. 9-9, at 37). The environmentalist groups claim this is a "material factual error" and thus, because the Decision Memo allegedly "express[ly] reli[es] on . . . such incorrect

information," the Forest Service's determination that the slopes are not an extraordinary circumstance was arbitrary and capricious.

While the environmentalist groups are correct that there appears to be an error in the Decision Memo, that alone is insufficient to prove the determination was arbitrary and capricious. They cite to *Van Abemma v. Fornell*, 807 F.2d 633, 639 (7th Cir. 1986), which states the rule that where an agency "bases its conclusions on entirely false premises or information . . . we would have difficulty describing its conclusions as reasoned; we would have to call them arbitrary and capricious." *Id.* However, while it is true that a decision based on entirely false information is clearly arbitrary and capricious, the Court must also "take care to distinguish between claimed deficiencies . . . that are 'merely flyspecks' and those that are 'significant enough to defeat the goals of informed decisionmaking and informed public comment.'" *Sauk Prairie I*, 320 F. Supp. at 1030 (quoting *Habitat Educ. Ctr., Inc.*, 673 F.3d at 528). For the environmentalists to ultimately prevail on the merits, they would need to prove that the mistaken steepness range was the basis for the challenged determination.

The discrepancy here, however, is merely a flyspeck. The environmentalist groups have offered no evidence to suggest that slopes of up to 35% would present an extraordinary circumstance where slopes of up to 22% would not. Nor can they show that the Forest Service believed that the distinction between 22% and 35% was meaningful; indeed, its internal documentation in the RPI acknowledges that the steepness of the slopes goes up to 35%. (Doc 9-10, at 14–15). This documentation nevertheless concludes that the slopes do not constitute an extraordinary circumstance and explains that BMPs

will be used to mitigate the slope and soil conditions, *id.*, which is echoed by the Decision Memo. (Doc. 9-5, at 3). In the Memo, the Forest Service specifically cites the Illinois Forestry BMP handbook, *id.*, which contains mitigation strategies for slopes of up to 60%. (Doc. 10-9, at 18).

In short, the environmentalist groups have not shown how they propose to illustrate that the incorrect range in the Decision Memo was the basis for the determination that the slopes were not an extraordinary circumstance. In light of the plain evidence that the Forest Service considered the problem of steep slopes and the lack of anything in the record to suggest the conclusion it reached was unreasonable, the Court finds that the environmentalist groups have failed to demonstrate a likelihood of success on the merits based on the slope steepness discrepancy.

### c. Soil erosion into Bell Smith Springs

Finally, the environmentalist groups argue that the Forest Service failed to consider the potential impact of soil erosion from the Project area via nearby tributaries to Bell Smith Springs National Natural Landmark. (Doc. 9, at 14). The Project area is on slopes above Hunting Branch, which is upstream of Bell Smith Springs. *Id.* If the logging were to cause soil erosion into Hunting Branch, the run-off could flow into the Springs. They claim that, because the Forest Service responded to comments about the Springs in its Decision Memo by stating that Bell Smith Springs is not within the Project area (Doc. 9-5, at 4), the Service "does not acknowledge" the "obvious potential impacts" to the Springs.

It is again plain from the record, however, that the problem of soil erosion and

runoff *was* considered by the agency. In the Decision Memo, the Forest Service specifically stated that BMPs

> will be used to minimize erosion and to prevent soil sedimentation into nearby water sources, specifically chapters four and five in the Illinois Forestry BMP handbook. Bare soils, such as log landings, will be seeded and skid trails will have erosion control methods in place to minimize erosion effects. Monitoring data from previous projects were analyzed and BMPs were effective in meeting project objectives.

(Doc. 9-5, at 3). This is a far cry from silence in the record as to whether an agency considered "the possibility of *any* environmental consequences, or the possibility of 'extraordinary circumstances.'" *Hamrick*, 107 F. Supp. 3d at 925. Indeed, here is the Forest Service considering and explaining how it plans to mitigate a potential extraordinary circumstance not even listed as a resource condition in the governing regulations. 36 C.F.R. § 220.6(b)(1) (2024); *see also Alaska Ctr. for Env't v. United States Forest Service*, 189 F.3d 851, 859–60 (9th Cir. 1999) (citing *Jones*, 792 F.2d at 829) (agencies may rely on planned measures mitigating potential environmental consequences of an action in determining that a CE applies). Because it is clear from the record that the Forest Service considered the potential extraordinary circumstance and came to a reasonable conclusion, the environmentalist groups have failed to demonstrate a sufficient likelihood of success on the merits of this argument, as well.

## II.     Insufficient disclosure

Finally, the environmentalist groups claim that—even if the Forest Service sufficiently considered potential extraordinary circumstances internally—the Service violated NEPA by failing to sufficiently disclose to the public the extent of that

consideration in its Decision Memo. (Doc. 1, at ¶¶ 83–88; Doc. 9, at 15). At oral argument, counsel for the environmentalist groups explained that, though the Forest Service conducted surveys and research, a member of the public reading the Decision Memo would not know it had done so. The member of the public would not know what the agency was relying upon to make its determination, because the Decision Memo does not say. Indeed, in the Decision Memo itself, the discussions of bats, slopes, and soil erosion are not located within the extraordinary circumstances section but are instead placed elsewhere.

In order to ultimately prevail on this ground, the environmentalist groups would need to prove that the Decision Memo violated some rule about what is required to be in such a disclosure. Thus, identifying that rule and the duty it imposes on the Forest Service is a prerequisite for demonstrating a likelihood of success on the merits to secure a preliminary injunction on this claim.

Counsel for the environmentalist groups acknowledged at oral argument that there are no specific rules about what an agency must disclose, but argued the Forest Service should be required to disclose what it relied on in making its determination.[5] But in the absence of a specific legal basis for imposing a heightened disclosure duty on the

---

[5] To support their claim, the environmentalist groups also point to language in *Hamrick v. General Services Administration*, 107 F. Supp. 3d 910, 918 (C.D. Ill. 2015), and in the Supreme Court's decision in *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989), indicating that NEPA's requirements serve a dual purpose: promoting informed agency decision-making, and guaranteeing that the public will be informed. The Court does not read either case to create in NEPA a separately cognizable duty of public disclosure. Nor does the Court read either case to articulate a standard for what information must be disclosed when an agency makes a CE determination (in particular, the *Robertson* case concerns an EIS, not a CE). These cases merely explain how the existing documentation requirements in the statutory and regulatory text serve more than one purpose.

Forest Service, this Court can require only what the statutory and regulatory text demand.

The text of NEPA itself is silent on the question. 42 U.S.C. § 4332(c) (requiring only that agencies prepare a detailed statement for any action "significantly affecting the quality of the human environment"). The then-extant Council on Environmental Quality regulations implementing NEPA required only that agencies making a CE determination "document such determination and . . . make it publicly available." 40 C.F.R. § 1501.4(b)(1). The old Forest Service CE regulations differentiate between CEs that require a Decision Memo and those that do not, *see* 36 C.F.R. § 220.6(d)–(e); when a Decision Memo is necessary, as here, the regulations specify the content that must be included. *Id.* § 220.6(f). In particular, a Decision Memo must include "the reasons for categorically excluding the proposed action including . . . [a] finding that no extraordinary circumstances exist." *Id.* § 220.6(f)(2). The regulations also permit Decision Memos to combine or rearrange the required sections so long as all the required content is included. *Id.* § 220.6(f).

Nowhere in the implementing regulations is there a requirement that an agency's Decision Memo reference every report relied upon. The only specific requirement applicable to this case is a requirement that the Decision Memo find no extraordinary circumstances exist. Here, where the Decision Memo explains that (1) the Forest Service conducted surveys of bats and concluded that habitat mitigations would "reduce potential adverse effects" to individual bats, (2) BMPs would be used to address the risks posed by steep slopes and potential runoff of erosive soils into nearby water sources, and

(3) that the agency had found "no extraordinary circumstances that would warrant further analysis and documentation," the textual requirements of the regulation are clearly satisfied. (Doc. 9-5, at 2–4). Though the environmentalist groups protest that the bats, slopes, and runoff are not mentioned in the section of the Decision Memo that lists in bullet form the Resource Conditions considered in the CE analysis, the applicable regulations explicitly permit the content of Decision Memos to be rearranged. 36 C.F.R. § 220.6(f).

In other words, it is plain from the record that the Decision Memo satisfies the disclosure requirements that were imposed at the time by the statutory and regulatory text. In the absence of any authority establishing that the Forest Service had a duty to publicly disclose more information than it did, there is no legal basis for this claim—meaning the environmentalist groups could not ultimately prevail. This is especially true in light of the deference owed to agency determinations of what to include in their environmental documentation; here, the Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497 (2025), is instructive. With respect to what information an agency must include in an EIS—the environmental document requiring the greatest level of detail—the Court explained that the question implicated agency expertise because the question is fact-sensitive by nature. *Seven County*, 145 S. Ct. at 1512–13. ("Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness.") Employing this deference, the Court finds that the environmentalist groups have not established a sufficient likelihood of success on the merits of their second claim.

## Conclusion

The environmentalist groups have failed to demonstrate a sufficient likelihood that they will succeed on the merits of either (1) their claim that the Forest Service acted arbitrarily and capriciously by determining that the Project was subject to a CE by failing to sufficiently consider potential extraordinary circumstances, or (2) their claim that the Forest Service acted arbitrarily and capriciously by failing to "fully and accurately" disclose to the public the information considered in making that determination. Because they have not met this threshold requirement for the issuance of a preliminary injunction, *see Incredible Techs.*, 400 F.3d at 1011, the Court finds it unnecessary to consider the questions of irreparable injury, the adequacy of their remedies at law, or the balancing of interests.

Plaintiff organizations Friends of Bell Smith Springs and the Regional Association of Concerned Environmentalists' motion for a preliminary injunction is **DENIED**. For the same reasons, the previously issued Temporary Restraining Order is hereby **DISSOLVED**.

IT IS SO ORDERED.

DATED:   September 11, 2025

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**