IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **FRIENDS OF BELL SMITH SPRINGS and REGIONAL ASSOCIATION OF CONCERNED ENVIRONMENTALISTS,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES FOREST SERVICE and DENNIS WILSON,**<br><br>**Defendants.** | **Case No. 3:25-CV-01377-NJR** |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This case involves a dispute over a proposed forest health project in the Shawnee National Forest. The project is designed to reduce overcrowding of hardwood trees in a section of forest covering roughly one-tenth of a square mile.

Plaintiff organizations Friends of Bell Smith Springs (FOBSS) and the Regional Association of Concerned Environmentalists (RACE) (together, the "environmentalist groups") say the United States Forest Service and District Ranger Dennis Wilson (together, the "Forest Service" or the "Service") violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, when it approved the project. (Doc. 36-1). The environmentalist groups ask this Court to grant summary judgment against the Forest Service.[1] (Docs. 52,

[1] Also pending before the Court is a fully briefed motion regarding the scope of the administrative record.

53). For the reasons set forth below, the Court grants the environmentalist groups' motion for summary judgment and sets aside the Forest Service's decision.

## BACKGROUND

This case concerns the McCormick Oak-Hickory Restoration Project (the "Project"). The Forest Service decided to permit commercial logging in the Project area—a section of Shawnee National Forest in Pope County, Illinois, roughly 67 acres in size—in an effort to address a decline in forest health. (AR 1, 703; *see* AR 138).[2] In this section of forest, stands[3] of hardwood trees had become "overstocked," meaning there were more trees than there are resources available to grow them. *Id.* at 703. This makes the trees more vulnerable to disease, drought, and infestation. *Id.* By permitting "intermediate thinning" of these stands through commercial logging, the Forest Service hoped to create gaps in the tree canopy and free up water and nutrients for new and existing oak and hickory trees; ultimately, the Forest Service believed the Project would improve forest resiliency and benefit wildlife. *Id.*

Because the Forest Service is a federal agency, there were procedures it had to follow before it could begin the Project. Like all federal agencies, its actions are governed by the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559, 701–706. The Project was also subject to NEPA, a procedural statute designed to protect the environment by

---

(Docs. 48, 58–59). But the only dispute concerns records relevant to the environmentalist groups' claims under NEPA, which the Court declines to decide. *See* note 4, *infra*. Although the briefs contain an academic disagreement about the scope of the administrative record in the ESA context, all parties agree which documents are reviewable by this Court as to the environmentalist groups' ESA claim. Accordingly, the motion will be denied as moot.

[2] Citations in this format are to the administrative record.

[3] A stand is a "continuous area[] with similar tree characteristics." (AR 703).

requiring federal agencies to consider the environmental consequences of certain actions.[4] *E.g.*, *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 177–78 (2025). And the Service had to comply with the ESA.

The ESA "affirmatively command[s] all federal agencies 'to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence' of an endangered species' or 'result in the destruction or modification'" of their habitat. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (emphasis omitted) (quoting 16 U.S.C. § 1536 (1976)). To that end, agencies considering action in an area where an endangered species might be present must prepare a "biological assessment" determining whether any endangered species might be affected. 16 U.S.C. § 1536(c). If the agency determines the species is likely to be affected, it must formally consult with a consulting agency (here, the Fish and Wildlife Service (F&WS)). *E.g.*, *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985), *abrogation on other grounds recognized by*, *Cottonwood Env't. L. Ctr. v. United States Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015). That consultation (sometimes referred to as "Section 7 consultation") culminates in the issuance of a biological opinion ("BiOp") by the F&WS stating whether the proposed action will jeopardize the continued existence of an endangered species, in which case it cannot go forward unless the F&WS can suggest an alternative (or the agency applies for and receives an exemption). *Id.*; 16 U.S.C. § 1536. If the BiOp states the proposed action will

[4] Because this dispute can be (and is) resolved without addressing the environmentalist groups' NEPA claims, the Court does not discuss them further. The Service's NEPA obligations and its efforts to comply therewith are summarized in this Court's order denying the environmental groups' motion for a preliminary injunction. *See Friends of Bell Smith Springs v. United States Forest Serv.*, 831 F. Supp. 3d 697, 700–01 (S.D. Ill. 2025).

not result in such jeopardy, it may still require the agency to implement measures to mitigate the action's impact on endangered species. 16 U.S.C. § 1536(b)(4).

Here, the Forest Service completed a biological assessment and concluded, *inter alia*, that the Indiana bat—a federally listed endangered species—was likely to be affected by the Project. (AR 216–36). For instance, if the bats went undetected in trees that were cut down, individual bats could be injured or killed. *Id.* at 14. Accordingly, pursuant to its Section 7 obligations, it initiated formal consultation with the F&WS. *See id.* at 237.

Before the F&WS could issue its BiOp, the Forest Service approved the Project in a document titled a "Decision Memo." *Id.* at 703–07. More than a month later, the F&WS issued the BiOp, which approved the Project subject to certain mitigation measures, including both measures expressly enumerated in the Forest Service's biological assessment and measures incorporated into the Forest Service's overarching program, the 2006 Shawnee National Forest Land and Resource Management Plan (the "2006 Plan"). *Id.* at 237–44; *see also id.* at 708–1011 (2006 Plan); *id.* at 1091–204 (the F&WS's BiOp for the 2006 Plan, a "programmatic biological opinion").

Eventually, the environmentalist groups initiated this suit on behalf of their members who enjoy the Project area and its surroundings in their current state. (Doc. 1). Their original complaint, which did not allege violations of the ESA, was filed on July 15, 2025. (Doc. 1). Just over a month later, after learning logging had begun on the Project, the environmentalist groups moved for and received a temporary restraining order halting the Project. (Docs. 9–12); *see also Friends of Bell Smith Springs v. United States Forest Serv.*, No. 25-CV-01377, 2025 WL 2490381 (S.D. Ill. Aug. 29, 2025). The Court quickly set

a hearing for argument on whether the temporary restraining order should be extended into a full preliminary injunction. (Docs. 13–14). The Court subsequently found that the environmentalist groups had not sufficiently demonstrated a likelihood of success on the merits; it therefore dissolved the temporary restraining order and declined to issue a preliminary injunction. (Doc. 15); *see also Friends of Bell Smith Springs v. United States Forest Serv.*, 831 F. Supp. 3d 697 (2025).

Following a temporary stay during the government shutdown (Doc. 20), the case began to progress. Multiple amended complaints (Docs. 30, 36-1), answers, and amended answers (Docs. 16, 39, 47, 56) followed,[5] during which time the environmentalist groups added their ESA claim. The administrative record was filed in January, and the parties settled on a briefing schedule for summary judgment[6] in April. (Docs. 35, 43–44). The environmentalist groups' motion for summary judgment (Docs. 52, 53) is now fully briefed (*see* Docs. 57, 60); additionally, the Court has heard oral argument (*see* Doc. 62) and solicited supplemental briefing (Docs. 64–68); *see also Friends of Bell Smith Springs v. United States Forest Serv.*, No. 25-CV-01377, 2026 WL 2111764 (S.D. Ill. July 22, 2026).

## LEGAL STANDARD

Agency action may be set aside only when it is found to be "arbitrary, capricious,

---

[5] This case has been plagued by disputes over the proper application of Rule 8 of the Federal Rules of Civil Procedure in actions under the APA. (*See* Docs. 23–27, 54–55; Doc. 41, at 1–2); *see also Friends of Bell Smith Springs v. United States Forest Serv.*, No. 25-CV-01377, 2025 WL 3537560 (S.D. Ill. Dec. 10, 2025); *Friends of Bell Smith Springs v. United States Forest Serv.*, No. 25-CV-01377, 2026 WL 1361482 (S.D. Ill. May 15, 2026). This accounts for the greater volume of pleadings than one might ordinarily expect in a case based on the administrative record.

[6] Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is the procedural vehicle through which judicial review of administrative action is conducted. *E.g.*, *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994).

an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is true even when the procedural vehicle is a motion for summary judgment. *Habitat Educ. Ctr., Inc. v. Bosworth*, 363 F. Supp. 2d 1090, 1095–96 (E.D. Wis. 2005) (treating cross-motions for summary judgment in an administrative review case as concerning the APA standard, not the typical Federal Rule of Civil Procedure 56 standard). And, although the ESA does not set forth a standard of review, courts apply the APA standard to ESA claims, as well. *E.g.*, *id.* Accordingly, this Court can only grant relief if the Forest Service's decision to approve the Project was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[7]

## DISCUSSION

The environmentalist groups argue that the Forest Service's decision to approve the project violated both NEPA and the ESA. They ask that the Court vacate the agency's decision, enjoin the agency from proceeding with the Project until it complies with NEPA and the ESA, and issue multiple specific declaratory judgments. (Doc. 36-1, at 51).

The Forest Service, on the other hand, argues first that this Court does not have subject matter jurisdiction over the environmentalist groups' ESA claim because either (1) the environmentalist groups lack standing or (2) their claim for relief is moot. (Doc. 57, at 14–19). Next, it argues that the environmentalist groups are wrong on the merits—that

[7] Arbitrary and capricious review "is narrow and requires that [the Court] 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.'" *Habitat Educ. Ctr., Inc.*, 363 F. Supp. 2d at 1096 (quoting *Highway J. Citizens Grp. v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003)). However, this case concerns a question not of whether the Forest Service reached a conclusion that was arbitrary and capricious, but whether their course of action was otherwise not in accordance with law; accordingly, the standard of review is less deferential. *E.g.*, 73 C.J.S. *Public Administrative Law and Procedure* § 303.

it complied with all applicable requirements of NEPA and the ESA. *Id.* at 19–34. And finally, it argues that vacatur would be unwarranted even if it had violated NEPA.[8]

**I. The ESA**

The essence of the environmentalist groups' claim is this: After the Forest Service determined that an endangered species was likely to be adversely affected by the project, it was legally required under the ESA to consult with the F&WS (which would ultimately culminate in the issuance of a BiOp approving the Project) before going forward. While the F&WS's BiOp approved the Project subject to certain mitigation measures, the Forest Service issued its Decision Memo some six weeks before the BiOp was issued. The environmentalist groups contend that this is a violation of the ESA. They ask this Court to vacate the agency action at issue and to grant injunctive and declaratory relief.

The Forest Service, on the other hand, contends first that the environmentalist groups do not have standing to bring this claim at all. And if they have standing, their claim became moot when the F&WS issued the BiOp.[9] And if the environmentalist groups have standing and their claim is not moot, the ESA was not violated because the Forest Service's consultation obligations were satisfied well in advance of any commitment of resources to the Project. And even if the environmentalist groups have standing and their claim is not moot and the ESA was actually violated, the Forest Service

---

[8] The Forest Service argues in its discussion of mootness that vacatur is not an available remedy under the ESA at all. (Doc. 57, at 17 n.3). The argument was rebutted in the environmentalist groups' reply brief (Doc. 60, at 3–4). Because the Court did not think either side had adequately addressed the issue, it asked numerous questions concerning the matter during oral argument and subsequently directed the parties to provide supplemental briefing. (Doc. 64; *see* Doc. 63; *see also* Docs. 65–68).

[9] These first two arguments rely on the assumption, discussed below, that vacatur of the decision to approve the project is not an available remedy.

argues the environmentalist groups are not entitled to vacatur.

**a. Subject matter jurisdiction**

The Court begins, as it must, with subject-matter jurisdiction. *E.g.*, *Continental Indemnity Co. v. BII, Inc.*, 104 F.4th 630, 636 (7th Cir. 2024) ("Subject matter jurisdiction is the first issue in any case . . . ." (quoting *Miller v. Southwest Airlines Co.*, 926 F3d 898, 902 (7th Cir. 2019))).

*i. Standing*

Article III standing is an unwaivable jurisdictional prerequisite for bringing a case in federal court. *E.g.*, *Dinerstein v. Google, LLC*, 73 F.4th 502, 511 (7th Cir. 2023) (citing *Nettles v. Midland Funding LLC*, 983 F.3d 896, 899 (7th Cir. 2020)). The doctrine of standing "traces its origins to Article III of the Constitution, which grants federal courts the power to resolve 'Cases' and 'Controversies.'" *Morgan v. Fed. Bureau of Prisons*, 129 F.4th 1043, 1048 (7th Cir. 2025) (citing *Dinerstein*, 73 F.4th at 511). To have standing to bring suit in federal court, "a plaintiff must have suffered (1) a concrete, particularized, and actual or imminent injury (an 'injury in fact') (2) that is fairly traceable to the defendant and (3) that is likely to be redressed by a favorable judicial decision." *Dinerstein*, 73 F.4th at 511 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Moreover, 'standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek.'" *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

Here, both plaintiffs are organizations seeking to sue on behalf of injuries sustained by their members. (*See, e.g.*, Doc. 53, at 11). To establish the ability to do so, each

environmentalist group must satisfy the test for "associational standing" by "show[ing] (1) 'at least one of its members would have standing to sue in their own right,' (2) the lawsuit protects 'interests germane to the organization's purpose,' and (3) the 'participation of individual members' is not necessary." *Wis. Voter All. v. Millis*, 166 F.4th 627, 638 (7th Cir. 2026) (quoting *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021)) (cleaned up).

Here, the second two prongs of the associational standing inquiry are satisfied. Both environmentalist groups are non-profit organizations that exist to protect the specific public lands at issue, meaning the suit protects interests germane to the organizations' purposes. (Doc. 52-4, ¶ 3; Doc. 52-5, ¶ 3). And the participation of individual members is not necessary, as the relief requested—vacatur, declaratory judgments, or an injunction—will, if granted, "inure to the benefit of those members of the association actually injured." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Shakman v. Clerk of Cook County*, 994 F.3d 832, 841 (7th Cir. 2021) ("Finally, [plaintiffs] sought injunctive relief and the appointment of a special master, neither of which requires proof of individual damages or otherwise demands participation of the Voters Organization's members." (citing *Hunt*, 432 U.S. at 343)). Whether the environmentalist groups have associational standing, then, turns on whether each has at least one member for whom the ordinary three elements of standing are satisfied: injury in fact, traceability, and redressability.

"An injury in fact must be 'concrete, particularized, and actual or imminent.' A 'concrete' injury," which may be either tangible or intangible, "has a 'close relationship

to a harm traditionally recognized as providing a basis for a lawsuit in American courts.'" *Wis. Voter All.*, 166 F.4th at 632 (first quoting *TransUnion*, 594 U.S. at 423; and then quoting *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 938 (7th Cir. 2022)). Tangible injuries are things "like monetary or physical harms" and "'readily qualify as concrete injuries.'" *Id.* (quoting *Freeman v. Ocwen Loan Servicing, LLC*, 113 F.4th 701, 708 (7th Cir. 2024)). "A 'bare procedural violation' of a federal statute"—such as the ESA violation alleged here—"does not count as an intangible injury" unless the plaintiff shows that the "'[d]eprivation of [the] procedural right'" affected "'some concrete interest.'" *Id.* at 632–33 (first quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016); and then quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).

The environmentalist groups each identify members who enjoy recreational activities in and around the Project area. (Docs. 52-4 to 52-6). These members regularly visit the Project area, from three times a year to at least twice a month (Doc. 52-4, ¶ 7; Doc. 52-5, ¶ 11; Doc. 52-6, ¶¶ 10–11); each mentions specific plans to return to the Project area once its closure (ongoing since September 30, 2025) has ended (Doc. 52-4, ¶ 7; Doc. 52-5, ¶ 11–12; Doc. 52-6, ¶ 10–11). Some have been visiting the Project area for decades—in one case, for over 60 years. (Doc. 52-4, ¶ 6; Doc. 52-5, ¶ 4). The members' recreational (and sometimes professional or educational) enjoyment of the Project area includes hiking, birdwatching, bat-watching, observation of native species, picnicking, entertaining out-of-town visitors, conducting guided tours, swimming in waters downstream from the Project, and gaining "spiritual inspiration." (Doc. 52-4, ¶¶ 4, 6–7, 9; Doc. 52-5, ¶¶ 4–5, 13; Doc. 52-6, ¶¶ 5–11). And the members specifically explain how,

if the Project is permitted to continue, their use and enjoyment of the Project area and its surroundings will be harmed. (Doc. 52-4, ¶¶ 8–10, 12–15; Doc. 52-5, ¶¶ 5, 13; Doc. 52-6, ¶¶ 12–13). In other words, the members have shown that they face a concrete (if intangible) injury from the continuance of the Project. *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–64 (1992).

The Forest Service argues (only as to the ESA claim) that the environmentalist groups have failed to show that their members have an adequately concrete injury-in-fact that is sufficiently traceable to the alleged ESA violation. (Doc. 57, at 15). But the Service demands too much. Here, the environmentalist groups have identified harms that flow from the Project's approval (including some bat-specific harms). The Project was approved, the environmentalist groups argue, in violation of the ESA's procedural requirements. Thus, the members' asserted injuries in fact (damages caused by the Project to their recreational enjoyment of the Project area) are indeed traceable to the challenged conduct (the approval of the Project in alleged violation of the ESA's mandate).

The Forest Service also argues that the environmentalist groups' injuries are not redressable because the ESA consultation process has already been completed. (Doc. 65, at 6–8). Thus, even if the Court were to vacate the Project's approval, the Service would not need to do anything else to comply with the ESA on remand. *Id.* at 8. It is therefore "indisputable" that, in the event the Court ruled for the environmentalist groups, the agency would simply "issue a new Decision Memo approving the Project with no substantial changes." *Id.* Thus, even vacatur would not redress the environmentalist groups' claimed injuries. *Id.*

But the Forest Service is incorrect. First, the Court does not think it is indisputable that the Forest Service will inevitably reach the same result if the decision to approve the Project is vacated. The Project was approved before the F&WS issued its BiOp; it is absolutely conceivable that, having vacated the Decision Memo, the Forest Service would reconsider the Project in light of the BiOp, which it definitionally could not have considered the first time. Second:

> The possibility that the Forest Service may ultimately proceed with the Project (with or without an EIS) does not preclude redressability. The United States Supreme Court explained years ago that "[a]gencies often have discretion about whether or not to take a particular action. Yet those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground. If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason. Thus respondents' 'injury in fact' is 'fairly traceable' to the [agency's] decision . . . even though the [agency] might reach the same result exercising its discretionary powers lawfully. For similar reasons, the courts in this case can 'redress' respondents' 'injury in fact.'"

*Monroe Cnty. Bd. of Comm'rs v. United States Forest Serv.*, No. 24-cv-01560, 2025 WL 2687723, at *6 (S.D. Ind. Sept. 18, 2025) (second through third alterations in original) (quoting *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998)). So too, here.[10]

Because each of the environmentalist groups has established the existence of

[10] To the extent that the Forest Service avers it will not reconsider its decision to approve the Project in light of the BiOp if the decision is vacated and remanded, the Court does not believe this is sufficient to deprive the environmentalist groups of standing. Otherwise, agencies could deprive federal courts of jurisdiction to hear any challenge to agency action merely by promising not to change their minds. *Cf. Gutierrez v. Saenz*, 606 U.S. 305, 318–20 (2025) (rejecting a similar argument). Rather, the Forest Service's assertion goes to whether any error was harmless, which is a remedial question. Because the Forest Service *could* change its decision in light of the BiOp if the Project approval were vacated, the environmentalist groups' injuries are redressable. The likelihood of such a change in decision is thus a question of harmless error, not justiciability, and is addressed later in this order.

members who would have standing to sue on their own behalf, the final prerequisite for the groups' associational standing has been satisfied. The Court concludes that the environmentalist groups have Article III standing to bring their ESA claim.

*ii. Mootness*

The same case or controversy requirement that gives rise to the doctrine of Article III standing discussed above also forbids federal courts from hearing cases that have become moot. *E.g.*, *Westmoreland v. Hughes*, 144 F.4th 952, 955 (7th Cir. 2025). A case becomes moot when a plaintiff loses her personal stake in the outcome of her lawsuit. *Id.* When that happens, the case is no longer justiciable under Article III of the Constitution and must be dismissed. *Id.*

The Forest Service argues that the environmentalist groups' ESA claim became moot when the F&WS issued its BiOp, thus "conclud[ing] the formal consultation process" and satisfying the Forest Service's obligations under the ESA. (Doc. 57, at 15–19). Originally, the Forest Service focused on an argument that neither injunctive nor declaratory relief would redress the environmentalist groups' injuries, as the Service no longer has any obligations under the ESA the Court could compel. *Id.*

But this argument was premised on the notion that vacatur is not an available remedy for ESA violations. *Id.* at 17 n.3. This premise was contested by the environmentalist groups in their reply brief, as they assert that vacatur is "the primary relief" they seek. (Doc. 60, at 3–4). They argue that vacatur is both an available remedy and one routinely used by courts to remedy ESA violations. *Id.* Thus, because vacating the decision to approve the Project would redress their injuries, they contend the case is

not moot. *Id.*

The Forest Service, on the other hand, argues that vacatur *wouldn't* redress the environmentalist group's injuries; thus, even if vacatur is available, the claim is still moot. (Doc. 65, at 8). This argument is, essentially, a retread of its redressability argument: the Forest Service asserts that the Project would remain unchanged even if the Court vacated the Decision Memo, because the Service has already finished the consultation required by the ESA. Therefore, the Service would simply re-approve the project with no substantial changes.

The Court disagrees, for two reasons. First, under the still-operative regulations implementing the ESA, federal agencies are required "[f]ollowing the issuance of a biological opinion" to "determine whether and in what manner to proceed with the action *in light of its section 7 obligations and the Service's biological opinion*." Responsibilities of Federal agency following issuance of a biological opinion, 50 C.F.R. § 402.15(a) (2026) (emphasis added). In other words, if the Court vacated the Forest Service's decision to approve the Project, the Service would be legally required to consider *whether and to what extent* to re-approve the Project *in light of the BiOp*, which it had not had the opportunity to do before. So while it is true that vacatur will not result in the issuance of a new BiOp or further consultation, it is not "indisputable that the Project would remain unchanged" if the decision to approve it were vacated. (Doc. 65, at 8).

Second, and more fundamentally, the Court rejects the Service's argument for the same reason it rejected it in the standing context. *See* note 10, *supra*. An agency cannot evade the jurisdiction of the federal courts merely by promising that it will not change its

mind even if a court orders it to reconsider; otherwise, an agency could act as arbitrarily and capriciously as it wished and simply moot every challenge that came its way. Fortunately, this is not the law. *Cf. Gutierrez v. Saenz*, 606 U.S. 305, 318–20 (2025). So even if the Forest Service were correct that it could simply re-approve the Project without at least considering the contents of the BiOp, its stated intention to do so would not moot this case.

Because the environmentalist groups' injuries remain redressable through vacatur, the mootness inquiry turns entirely on whether vacatur is an available remedy for a violation of the ESA. If vacatur is available, the environmentalist groups' ESA claim is not moot.[11]

The Court begins with the text. The ESA authorizes enforcement through "[c]itizen suits," whereby "any person may commence a civil suit on his own behalf . . . to enjoin any person, including . . . any . . . agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)–(g)(1)(A). While the Forest Service invokes this language to suggest

---

[11] The Court assumes, without deciding, that the converse is also true: if vacatur is not available, the claim *is* moot. The Forest Service argues that requests for injunctive and declaratory relief—the other two forms of relief sought by the environmentalist groups (Doc. 36-1, at 51)—are moot now that the Forest Service has completed its Section 7 consultation with the F&WS. (Doc. 57, at 10–13). During oral argument, the Court asked counsel for the environmentalist groups whether this was correct. At first, counsel answered in the affirmative: "Yes, there's certainly nothing the Court can order injunctive-wise." He then appeared to backtrack, suggesting the Court could order the agency to reconsider its decision in light of the BiOp without first vacating it. He went on to assert that "declaratory relief would be appropriate here, too, since there's not that much law on the timing of the BiOp, and that would certainly be helpful to instruct the agencies that they are required to get these BiOps before they make substantive decisions, so I think that is not meaningless relief of a declaratory judgment here." But because the Court concludes that vacatur is available, that the ESA claim is not moot, and that vacatur is warranted, it need not go further to decide the question.

that only injunctive relief is available, the environmentalist groups point to subsection (g)(5), which goes on to elaborate that "[t]he injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or limitation or to seek any other relief." In other words, while the ESA does not create the power to vacate agency action, neither does it limit that power if it exists elsewhere. *See Pac. Rivers Council v. Shepard*, No. 11-CV-442, 2012 WL 950032, at *5 (D. Or. Mar. 20, 2012) (describing § 1540(g)(5) as an "express savings clause that preserves the availability of equitable remedies beyond the power to enjoin an unlawful agency action").

And that power does exist elsewhere. "[F]ederal courts have equitable power to order vacatur even in the absence of a specific statutory authorization," *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 50 (D.D.C. 2020) (first citing 73A C.J.S. *Public Administrative Law and Procedure* § 552 (2020)[12]; and then citing *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 70–71 (1992)); *see also Shepard*, 2012 WL 950032, at *5 (explaining that "vacatur and remand are commonly-employed equitable remedies under the APA and ESA to address unlawful agency action" (citing *Defs. of Wildlife v. United States Env't. Prot. Agency*, 420 F.3d 946, 978 (9th Cir. 2005), *rev'd on other grounds*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007))). And "[n]othing in the [ESA] divests the federal courts of their traditional power to vacate unlawful agency action."[13] *Id.* So, because the power to

[12] This section of the Corpus Juris Secundum is, as of August 21, 2026, available at 73A C.J.S. *Public Administrative Law and Procedure* § 590 (2026).

[13] Even if vacatur were not a traditional equitable remedy available to this Court, the APA itself provides for vacatur as a remedy in judicial review of administrative actions. 5 U.S.C. § 706(2); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 603 U.S. 799, 826–43 (2024) (Kavanaugh, J., concurring)

vacate unlawful agency action exists independently of the ESA, and the ESA does not restrict that power, vacatur is an available remedy in ESA citizen-suits.

The Court concludes that the environmentalist groups' ESA claim is not moot because their injuries remain redressable: even though the Section 7 consultation process was completed after the Project was approved, this Court could vacate the Project and require the Forest Service to reconsider its decision in light of the results of the ESA consultation process.

**b. ESA violation**

Having satisfied itself that this claim is justiciable, the Court next considers whether the Forest Service actually violated the ESA. Despite the complexity of the jurisdictional questions above, the merits of this claim are surprisingly simple. The record cannot be disputed: the Forest Service decided to approve the Project (AR 703–07 (dated October 7, 2024)) before the Section 7 consultation process was completed by the issuance of the BiOp (AR 237–44 (dated November 19, 2024)). The only question to resolve is purely legal: does the ESA require agencies to complete their consultation obligations *before* taking final agency action? If so, the Forest Service's decision to approve the Project was "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The Forest Service argues that it was not required to complete its consultation

(providing an in-depth defense of the reigning view that "[t]he APA authorizes vacatur of agency rules"). While the environmentalist groups' claim is brought under the ESA's citizen-suit provision rather than the APA directly, courts have held that the APA's remedies are available in suits under the ESA. *Nat'l Parks Conservation Assoc. v. Jewell*, 62 F. Supp. 3d 7, 20 (D.D.C. 2014); *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998); *cf. Bennett v. Spear*, 520 U.S. 154, 175 (1997) ("Nothing in the ESA's citizen-suit provision expressly precludes review under the APA, nor do we detect anything in the statutory scheme suggesting a purpose to do so.").

obligations prior to the decision to approve the Project. (Doc. 57, at 19–22). It contends that the ESA is silent on the question of timing, and in fact "expressly contemplates" that consultation might end after an agency takes action. Specifically, the Service invokes 16 U.S.C. § 1536(d), which reads as follows:

> (d) Limitation on commitment of resources
>
> After initiation of consultation required under subsection (a)(2), the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

§ 1536(d). It then argues that it did not make any such irreversible or irretrievable commitment of resources until well after the BiOp was issued: "Indeed, the Forest Service did not advertise a timber contract sale for the Project until January 2025." (Doc. 57, at 20 (citing Doc. 10-1, ¶ 5)[14]). On this view, the deadline for Section 7 consultation is the date at which resources are irretrievably committed; so long as the BiOp was issued before that date, the Forest Service did not violate the law.

The environmentalist groups, on the other hand, argue that this interpretation

[14] The Court notes that, in the Forest Service's response (Doc. 58, at 2 n.1) to the environmentalist groups' assertion that review under the ESA is not limited to the administrative record (Doc. 48, at 8), the Service argued that the Court *is* limited to the administrative record. If the Service is correct, the Court should not consider extra-record evidence like Defendant Dennis Wilson's declaration (Doc. 10-1). But because the Service relies on that declaration in its briefing, and because the environmentalist groups do not object (*see* Doc. 60), the Court will consider Wilson's declaration in this order. Similarly, because the environmentalist groups invoke and rely on the Forest Service's pleadings (*e.g.*, Doc. 53, at 15–16), and because the Service does not object (*see* Doc. 57), the Court will consider the Service's admissions in its pleadings. *See also Friends of Bell Smith Springs v. United States Forest Serv.*, No. 25-CV-01377, 2025 WL 3537560, at *2–3 (S.D. Ill. Dec. 10, 2025) (finding "no authority establishing a rule in the Seventh Circuit permitting deviation from the pleading requirements of the Federal Rules of Civil Procedure in APA review cases" and ordering the Forest Service to file an answer that complied with those Rules); *Friends of Bell Smith Springs v. United States Forest Serv.*, No. 25-CV-01377, 2026 WL 1361482, at *2 (S.D. Ill. May 15, 2026) (noting that the Court would deem admitted any allegations not denied pursuant to Rule 8(b)).

"would turn ESA Section 7's mandatory procedures into meaningless paper shuffling." (Doc. 60, at 4). If an agency can make a final decision to approve a project that the agency itself has determined is likely to adversely affect an endangered species before the consultation process is complete, it renders pointless the protections Congress enacted.

Again, the Court begins, as it must, with the text. Section 1536(d) can indeed be read as the Forest Service urges: as setting the deadline for consultation as the point in time at which resources are irretrievably committed. But it is also susceptible to another reading: that § 1536(d) establishes an independent requirement that the agency maintain the status quo during the consultation process without disturbing the "ESA's clear mandate that a comprehensive biological opinion . . . be completed before initiation of the agency action." *Conner v. Burford*, 848 F.2d 1441, 1455 & n.34 (9th Cir. 1988) ("Section [1536](d) does not amend section [1536](a) to read that a comprehensive biological opinion is not required before the initiation of agency action so long as there is no irreversible or irretrievable commitment of resources. Rather, section [1536](d) clarifies the requirements of section [1536](a), ensuring that the status quo will be maintained during the consultation process." (citing 16 U.S.C. § 1536(d))).

In the Court's view, the latter reading is the better one. The ESA requires agencies contemplating action that may harm an endangered species to engage in consultation. 16 U.S.C. § 1536(a). The statute contemplates that sometimes the consulting agency will issue a BiOp that determines the action will "jeopardize the continued existence of" the endangered species. *Id.*; § 1536(b)(3)(A). What an agency must do then to proceed with its action—either implement the consulting agency's suggested "reasonable and prudent

alternatives," § 1536(b)(3)(A), or apply for an exemption, § 1536(g)—depends on the *content* of the BiOp. An agency cannot know whether it must apply for an exemption unless, "*after* consultation under subsection (a)(2)," the consulting agency issued an "opinion under subsection (b) indicat[ing] that the agency action would violate" the ESA. § 1536(g)(1) (emphasis added). None of these express commands of the statute would make any sense if the agency could begin its action prior to receiving the BiOp determining whether the proposed action was permissible.

Further support for this reading comes from the ESA's implementing regulations. *See* 50 C.F.R. § 402.01. One such regulation, invoked by the environmentalist groups, reads as follows:

> Following the issuance of a biological opinion, the Federal agency shall determine *whether and in what manner to proceed* with the action in light of its section 7 obligations and the [F&WS's] biological opinion.

50 C.F.R. § 402.15(a). This regulation makes the timeline explicit: *after* the BiOp is issued, the agency must *then* consider its action based on what the BiOp says.[15]

Lastly, the Forest Service's position—that agencies may take action without completing their consultation obligations so long as they do not irretrievably commit any resources—is in irreconcilable tension with another of its arguments: that it had no obligation to review or consider the BiOp after it was received. (Doc. 56, ¶ 9). It cannot be

[15] While regulations are not necessarily informative of statutory meaning, this regulation was certainly violated by the Forest Service: it determined whether and in what manner to proceed with the Project *preceding* the issuance of a biological opinion, not following it. The Service simply could not have considered the action "in light of" the F&WS's BiOp before it was issued. And the ESA authorizes suits to enforce its implementing regulations as well as its statutory provisions itself. 16 U.S.C. § 1540(g)(1)(A). Accordingly, even under a contrary interpretation of § 1536, the Forest Service has committed a violation.

true that the Forest Service can make a final decision approving a project so long as it hasn't begun work on that project *and* that the Forest Service does not need to review the ESA-mandated BiOp concerning its already-made decision. It would not, on that view, be possible to comply with "the terms and conditions" a BiOp imposes even when the consulting agency makes a no-jeopardy determination. § 1536(b)(4). This position is untenable.

In sum, the ESA requires agencies to complete their consultation obligations *before* taking final agency action. Because the Forest Service did not do so, it violated the ESA.

**c. Remedy**

The Forest Service argues that, even if it did violate the ESA, the Court should refrain from vacating the decision to approve the Project for two reasons. First, it argues that any legal error it committed was harmless, as the BiOp identified "no new information" that was not included in the biological assessment; because the agency considered the biological assessment when it approved the Project, the Service argues, all the information in the BiOp was properly considered at the relevant time. (Doc. 65, at 2–4; *see also* Doc. 57, at 20–21 (making arguments that go to harmlessness rather than the existence of a violation)). Second, even if the error was not legally harmless, the Service argues that equity demands this Court leave the Decision Memo in place. (Doc. 57, at 34–35; Doc. 65, at 2, 4–6).

In other words, the Forest Service essentially argues that vacating its decision to approve the Project would be pointless. When the Service approved the project, it considered its biological assessment. The BiOp, the Service claims, adds nothing of

substance to that biological assessment. Therefore, a do-over would "unquestionably" lead to the same result. (Doc. 65, at 3).

The Forest Service is correct that, under the harmless error doctrine, "remand and vacatur of an agency decision 'may be unwarranted in cases where "[t]here is not the slightest uncertainty as to the outcome of the agency's proceedings" on remand.'" *Id.* at 2 (alteration in original) (quoting *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 630 (2023) (per curiam)). But the Service is wrong to suggest that the environmentalist groups "can point to no new information regarding the Project's effects on Indiana bats that 'were not already identified' in the Forest Service's biological assessment." *Id.* at 4 (quoting *Ind. Forest All. v. McDonald*, No. 16-cv-03297, 2017 WL 131739, at *9 (S.D. Ind. Jan. 13, 2017)).

The environmentalist groups argue that the BiOp has a "new finding" that "adverse impacts to the bat would be greater if logging occurred 'during the summer active season.'" (Doc. 60, at 5 (quoting AR 240); *see also* Doc. 60, at 2). The F&WS's BiOp further "assumes," according to the environmentalist groups, "that the project will be 'implemented consistent with' the 2006 Shawnee National Forest Land Resource and Management Plan, including its standards and guidelines for protecting listed bat species." (Doc. 68, at 3 (quoting AR 238); *see also* AR 238 (explaining that the focus of the BiOp was determining whether, *inter alia*, the Project adheres to "the appropriate Terms and Conditions associated with the Reasonable and Prudent Measures identified in" the 2005 programmatic biological opinion)). Specifically, counsel for the environmentalist groups explained in oral argument that one of the mitigation measures in the 2006 Plan and the 2005 programmatic biological opinion is a provision disallowing the cutting of

potential roost trees between April 1 and September 30 "unless necessary for human safety or to accomplish project objectives." (AR 1153–56; *see also* Doc. 68, at 3). By contrast, the environmentalist groups assert, the biological assessment contains no such finding and makes no such assumption. (Doc. 68, at 3).

The environmentalist groups are correct that the BiOp acknowledges that the greatest risk to the Indiana bat is "most likely" to be either "injury or death of individual" Indiana bats "from direct exposure to tree removal during the summer active season," but that the F&WS "expect[s] the potential for death or injury to be minimal *given adherence to the standard and guidelines provided in Appendix A of the 2005 programmatic [biological opinion]*, and implementation of several Bat Conservation Strategy . . . measures incorporated into the [biological assessment]." (AR 240 (emphasis added)). And, indeed, Appendix A provides the requirement invoked by the environmentalist groups. *See id.* at 1186. The environmentalist groups are further correct that the biological assessment does not address this requirement: while it invokes mitigation measures from the 2024 Bat Conservation Strategy related to removing snags[16] during the summer occupancy period, as well as measures meant to address herbicide use and "fireline construction" *id.* at 222–23, the biological assessment does not address the (still-operative[17]) requirements from the 2005 programmatic biological opinion related to the cutting of trees during the summer occupancy period.[18]

---

[16] A snag is a dead tree which remains standing. (AR 1349).

[17] (*See* AR 1314 (explaining that the forest plan was not replaced, amended, or revised by the 2024 Bat Conservation Strategy)).

[18] Although this is not outcome-determinative, the Court also finds it significant that the BiOp appears to distinguish between the standards and guidelines contained in "Appendix A of the 2005 programmatic

Ultimately, the Court finds that the result on remand would not be a foregone conclusion. While it is true that the biological assessment was thorough and covers much of the same ground as the BiOp, the Court is persuaded by the environmentalist groups that there are at least differences in emphasis and focus that could lead the Forest Service to alter the Project in the event it is ultimately re-approved. For instance, at oral argument, counsel for the Forest Service explained that, under the Project as currently constituted, it does not control the timing of the timber harvest:

> The Forest Service is not doing the timber harvest in this case, they are not deciding when it's being done for the most part. (And I say "for the most part" because they are not going to let it be done in the wet season if they need to protect the forest lands and there may be other protection to the species, I don't know.) But the contractor decides when they are going to do the work in this case. And in this case, as Your Honor is aware, the contractor went out in the forest in August of 2025.

In other words, the Service did not require the contractor to avoid logging between April and September. But this statement also makes clear that it *could* so require, as it already will not permit the contractor to work during the wet season.

On remand, the Forest Service could conclude that, given the BiOp's increased emphasis on the standards and guidelines established at the programmatic level, it ought to alter the Project by requiring the contractor to perform its work outside of the summer occupancy period. Or it could decide to perform the harvest itself, rather than through

[biological opinion]" and the Bat Conservation Strategy measures "proposed and incorporated into the [biological assessment]." (AR 238). The wording seems to suggest that, while the Project was approved by the F&WS on the assumption that it complied with, *inter alia*, the prohibition on cutting potential roost trees from April to September unless necessary for human safety or to accomplish Project objectives, the F&WS read the Forest Service's biological assessment to be focused more strongly on the measures from the Bat Conservation Strategy.

outside contractors. Or it could decide to re-approve the Project exactly as it is. But there is more than the "slightest uncertainty," *Calcutt*, 598 U.S. at 630, as to which decision the Forest Service will make. And the fact that the Forest Service *could* make the same decision again does not render its error harmless.

The Forest Service's second remedial argument is that the Court should refrain from exercising the equitable remedy of vacatur because the disruptive consequences of vacatur outweigh the seriousness of its error. (Doc. 57, at 34–35; Doc. 65, at 2, 4–6). The Service explains that the work is partially completed, and that the timber has been cut on more than half of the Project area. By vacating the decision to approve the Project, the Court would be "delay[ing] restoration actions that are necessary to maintain forest health," and "could reduce wildlife habitat, increase soil erosion, and increase the risk of damage to the Project area from insects and disease." (Doc. 57, at 35). It further cites the risk of negative impacts to the local economy and the potential financial liability of the Forest Service to the purchaser of the timber. *Id.* And in both oral argument and the latest round of briefing, the Service emphasized that much of the timber that has already been cut is currently lying on the ground, where it will begin to depreciate in value as it rots. (Doc. 65, at 6).

The Court is unpersuaded. As the environmentalist groups point out (Doc. 68), most of the harms cited by the Forest Service already exist *right now*, prior to any vacatur. Just over a year ago, this Court halted the Project by issuing a temporary restraining order. (Doc. 9); *see also Friends of Bell Smith Springs*, 2025 WL 2490381. Even though the contractor had begun working only eight days prior to that order, work was already

completed on "approximately 40 of the 67 acres in the Project." (Doc. 57, at 13). The Court lifted its temporary restraining order 13 days later and declined to issue a preliminary injunction, thus freeing the Forest Service's contractor to continue its work. (Doc. 15); *see also Friends of Bell Smith Springs*, 831 F. Supp. 3d 697. Nevertheless, the Forest Service says the contractor has not returned to complete its work in the nearly full year since. (Doc. 57, at 13).

In other words, all of the harms contemplated by the Forest Service when discussing vacatur are already accruing through its contractor's inaction. The Court has not prevented the Forest Service from requiring its contractor to re-initiate work, from hiring a different contractor, or from finishing the work itself. As evidenced by the initial speed of progress, the Project might have been finished in only a few more days of work (which, unlike the issuance of the BiOp, would truly have mooted this case). And the Forest Service has made no representation that, in the absence of vacatur, the contractor will return to the site or that the Project will be completed with sufficient alacrity to avoid the disruptive consequences the Service fears. Therefore, the Court does not find that equity demands withholding vacatur. The Court will set aside the Decision Memo approving the Project as not in accordance with law.

## CONCLUSION

The administrative record demonstrates that the Forest Service's decision to approve the Project violated the ESA and was thus "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Consequently, the Court **GRANTS** the environmentalist groups' motion for summary judgment (Doc. 52) and **DENIES as moot** their motion to

clarify the scope of the administrative record (Doc. 48). The Court **SETS ASIDE** the agency action at issue and **REMANDS** the matter to the Forest Service for proceedings consistent with this order.

**IT IS SO ORDERED.**

**DATED: August 31, 2026**

Nancy J. Rosenstengel

**NANCY J. ROSENSTENGEL**
**United States District Judge**